# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

PATRICK EDWARD FREDERICKS,

Defendant-Appellant.

UNPUBLISHED
July 14, 2015

No. 321940
Kalamazoo Circuit Court
LC No. 2013-000964-FH

Before: SERVITTO, P.J., and BECKERING and BOONSTRA, JJ.

PER CURIAM.

Defendant was convicted, following a jury trial, of operating and/or maintaining a methamphetamine laboratory, MCL 333.7401c(2)(f). The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to 51 months to 20 years' imprisonment. He appeals by right. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

On the morning of May 25, 2013, Kelly Main heard a "loud bang" and contacted the police. The noise sounded like a gunshot; Main believed the noise came from inside the building where she resided. Main testified that there were two units in her duplex, one occupied by her and one occupied by defendant.

Michigan State Police Trooper Dan Lewis and Kalamazoo County Sheriff's Deputy Rodney Rought were dispatched to defendant's residence. Lewis arrived shortly before Rought. The officers had been informed that, a couple of days earlier, a subject at the residence had attempted suicide; thus, they believed they were responding to a possible suicide. Upon arriving at the scene, the officers made contact with Main and her boyfriend, Scott Drummond, who stated that the noise sounded like a gunshot that came from defendant's unit, and that they were concerned that someone was hurt. The officers observed that defendant's curtains were drawn tightly so that no one could see inside. The officers knocked on defendant's door, but did not receive an immediate response. After knocking on the front door, the officers split up to go to the back door and to knock on windows. According to Rought, there was a "huge delay"— approximately five minutes—between the time they "bang[ed] on the windows [and] on the doors" to the time defendant came outside.

-1-

When defendant opened the door, he appeared nervous; he was sweating and "jittery." Lewis described this jitteriness as "tweaking," which he indicated was a common side effect of using methamphetamine. Rought also testified that defendant was not acting normally when they first made contact with him. Defendant was sweating "profusely," and his speech was slow and not methodical. The officers observed red marks around defendant's mouth and cheek area. Rought testified that defendant had what appeared to be "fresh" burns on his face. Defendant's facial hair was "patchy," and the patchy spots were red, sore, and "oozing like . . . a runny liquid." Defendant told the officers that these marks were from ingrown hairs that he had been picking off of his face.

Lewis explained to defendant the reason they had responded to his residence. Defendant denied that anything was going on inside his apartment. Defendant stated that he had heard a "loud bang" that came from the northwest. Rought told defendant that his neighbors were adamant that the noise had come from inside the building and that they believed it was a gunshot. Rought described defendant's demeanor as "evasive." He testified that defendant was not "being straight up" while they were asking him questions to determine what had happened and whether someone was injured inside the residence.

After speaking with the officers outside for a period of time, defendant gave them permission to enter his residence and do a "cursory walkthrough" to ensure that no one inside was injured. No one else was present inside the house at the time; defendant stated that the others who lived there were all at work. Lewis described defendant's house as "orderly" and not in any disarray. Rought similarly testified that, during this initial search, nothing caught his attention apart from defendant's evasiveness and nervous behavior. While speaking with defendant, Rought conducted a pat-down search of defendant's person for any weapons; Rought testified that this was because of defendant's behavior and because they had yet to determine whether the noise heard was a gunshot. While performing the pat-down search, Rought found a makeshift methamphetamine pipe in defendant's pants pocket. Rought testified that the makeshift pipe was a plastic pen that had been taken apart and cut so that it was smaller and not functional as a writing instrument. The pen was charred at one end, which was consistent with the way such instruments were typically used to smoke methamphetamine. Rought asked defendant if the pen was a methamphetamine pipe. He testified that defendant did not verbally state yes or no, but rather nodded in agreement.

At that point, the officers decided to conduct an investigation into defendant's possession or manufacture of methamphetamine, which was not their initial concern in responding to the call. Rought testified that he told defendant that they were going to apply for a search warrant and that defendant was not allowed inside his residence in the meantime. Rought told defendant that he was free to go if he wished. In beginning their investigation, Rought checked "METH Watch," an electronic database that logs each time someone purchases a product containing pseudoephedrine, an ingredient used in manufacture of methamphetamine. Rought testified that through METH Watch, he found that defendant had purchased cold medicine containing pseudoephedrine on a regular basis, approximately 2 to 3 boxes a month, over the time span of one year. Rought testified that frequent purchases, such as in this case, are an indicator of using cold medicine for an illegal purpose, as it contains the key component in the chemical process of making methamphetamine. With this information and that gathered from speaking with

defendant at his residence, Rought obtained a search warrant for defendant's residence, outbuildings, and vehicles. When Rought returned with the search warrant, defendant had left.

Rought first searched defendant's vehicle and found a large garbage bag containing several components that would typically be used in the "Red 'P' Method" of making methamphetamine.[1] Rought also searched inside defendant's residence and located items that were indicators of manufacturing methamphetamine in the bedroom, bathroom, and kitchen. Rought testified that it was not "normal" to find many of these items in a kitchen; however, with methamphetamine laboratories, it is common to find manufacturing components in a kitchen because there is a water source and because of its convenience to use for storage and to clean up a mess. Rought had some of the seized items tested for methamphetamine, but received no positive laboratory reports, which, he testified, was not unusual.[2]

As a result of the investigation, Rought believed that the explosion that Main heard had occurred when defendant was making methamphetamine in his kitchen. He testified that he believed that defendant had to quickly disguise what he was doing and clean up the kitchen when law enforcement arrived, which explained why defendant did not come outside immediately when the officers were knocking on his windows and doors. Upon finishing the investigation inside defendant's residence, Rought had a "hazardous" sticker placed on the window of the residence to show that it contained a methamphetamine laboratory, was deemed contaminated, and needed to be cleaned up.

Defendant presented a different version of the events of that day. According to defendant, he drove to Allegan on May 24, 2013 with his daughter for a Memorial Day sale, where his daughter purchased a treadmill. Defendant and his daughter tried to place the treadmill into the back of his vehicle, but because his tools were there, the treadmill would not fit. Defendant testified that there were no garbage bags in the back of his vehicle at that time and that he had never seen the garbage bag that the officers found the following day.

On the morning of May 25, 2013, defendant's roommate, Jason Sears, and defendant's daughter drove defendant's vehicle to Burger King, where they worked, around 4:30 a.m. Defendant's daughter returned to defendant's house with his vehicle around 8:00 a.m., and then defendant drove her and her boyfriend back to Burger King. After dropping them off at work, defendant went to Wal-Mart and then back home. Defendant was lying in bed and playing on his computer when he heard a "large bang" that sounded like a firecracker. Defendant wondered what had caused the noise, so he walked out his front door and around the back of his residence. He did not see any smoke or see any other neighbors outside, so he assumed that a neighbor had shot off a firework or a gun. Defendant testified that he was not concerned because no other neighbors appeared to be concerned.

---

[1] The "Red 'P' Method" is also referred to as the red phosphorus method.

[2] Several items found inside defendant's residence, including Miracle Grow, lye, and charcoal lighter, were consistent with those used in the "one-pot method," another method for making methamphetamine.

Approximately 10 minutes later, defendant heard a knock on his door and heard, "[P]olice open up." Defendant testified that he immediately opened the door to see a state trooper standing in front of him with a pistol drawn. Defendant also saw a fire truck, an ambulance, and a coroner's vehicle at his residence. The officer asked for "Jason," so defendant informed him that Sears was at work. Defendant then stepped out onto his front porch to speak with the officer.

Defendant testified that at some later point, more officers arrived. The officers searched his house and verified that there was no body or anything of interest inside, so the ambulance and fire trucks left. Then, "all of a sudden," Rought walked into the house and "[d]idn't even acknowledge" defendant. Defendant and the other officers followed Rought inside. Defendant testified that the officers surrounded him in his house, and that he was "scared to death." Defendant testified that Rought "got in [defendant's] face" and began asking him about the explosion. Defendant informed Rought that he believed the explosion had come from a back field and that officers had already searched his house. Rought told defendant that he had spoken with defendant's neighbors and knew that defendant was not telling the truth.

With respect to the makeshift pipe that Rought had found in defendant's pocket, defendant testified that he had found it lying in his doorway when he walked inside after returning home from Wal-Mart earlier that morning. Defendant testified that anything he finds throughout the day goes into his pockets, and he empties his pockets onto his dresser at night. Rought asked defendant if he knew that the pen was used to smoke methamphetamine. Defendant testified that he responded that he knew what it was used for, but that he does not smoke methamphetamine. Defendant stated that after Rought patted him down, the officers asked for permission to search defendant's residence, but that he did not grant them permission because they had already looked through his house. Defendant testified that the officers "[s]at there and ridiculed" him, told him that they wanted to help him if he had a problem with methamphetamine, and laughed about the burns on his face. Defendant testified, however, that the marks on his face had been there for approximately one week. He at first thought that they were from ingrown hairs; however, three days after this incident, he went to the emergency room and learned that he had MRSA.[3]

In the meantime, Sears and defendant's daughter were working at Burger King. Tonia Richards, who also worked there, testified that Sears received a telephone call at work that caused him to panic. After the telephone call, Sears "stopped working and went straight to the office and was really kind of fidgety." Sears told Richards that the telephone call concerned the fact that police were present at defendant's residence. Richards testified that Sears did not stay at work for the remainder of the day; instead, he left on foot. Sears informed Richards that he was leaving because he had drugs in his pocket. Richards testified that defendant's vehicle was

---

[3] "Methicillin-resistant Staphylococcus Aureus (MRSA) infection is caused by a strain of staph bacteria that's become resistant to the antibiotics commonly used to treat ordinary staph infections." See http://www.mayoclinic.org/diseases-conditions/mrsa/basics/definition/con-20024479 (last accessed June 11, 2015).

in the parking lot when Sears left. According to Richards, defendant's daughter brought defendant his vehicle around 10:00 or 11:00 a.m., and then defendant drove her back to work.

Defendant testified that the officers attempted for about 1-1/2 to 2 hours to get his consent to search, but that he did not consent. Defendant testified that the police eventually told him that he was free to go. Defendant left his home about 30 minutes later. By the time he returned home, the officers were no longer there, but his house was in "total disarray." Later that evening, Sears also returned to defendant's residence; however, defendant testified that he "sat in a corner and wouldn't talk to" anyone. Defendant testified that all he heard Sears talk about, on May 25, 2013, was killing himself.

According to defendant, about three weeks after the officers searched his residence, it was condemned. Defendant moved out of his house and lived elsewhere for approximately three more weeks. Thereafter, he noticed that the condemnation sticker was removed, so he returned back to the residence.

With respect to the items located by the officers during their search, defendant explained why he kept several of these items in his home. Defendant testified that the muriatic acid was used to take rust off of rocks in the drive-through area at Burger King. He kept it in his home because it was not an approved item to be kept on the Burger King premises. The hydrogen peroxide bottles were his daughter's, whom defendant testified was a "clean fanatic." Defendant testified that an uncapped bottle of liquid heat was used for his lawn equipment. He testified that he did not know why the bottle was uncapped, but that the cap was probably sitting in his backyard by one of his tractors. The funnel was used to put oil or liquid heat in his lawn equipment. Defendant testified that he removed these items from his back shed in the winter and kept them in his house because the shed was not heated. With respect to a white shirt found covered in red stains, defendant testified that the shirt was one of his work shirts; the stains could have been from barbecue sauce, ketchup, or "the stainless steel upfront" at Burger King. With respect to the items found in the garbage bag and a 20-ounce Coca-Cola bottle filled with petroleum distillate found between his mattresses, defendant testified that he knew nothing about these items. Regarding the contents of the garbage bag, he testified, "If I would have found anything like that or even noticed anything like that, I would have called the cops myself."

The jury convicted defendant as described above. On February 5, 2014, prior to sentencing, defendant filed a motion for a new trial in the trial court and requested a *Ginther*[4] hearing. Defendant's motion for a new trial was based on several alleged instances of ineffective assistance of counsel. The trial court denied defendant's motion and his request for a *Ginther* hearing on the grounds that defendant failed to make even an initial showing that suggested his counsel had been ineffective.

On April 18, 2014, defendant filed a "Motion to dismiss for violation of Fourth Amendment rights, notwithstanding [the] jury verdict." The trial court denied the motion. This appeal followed.

---

[4] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

## II. INEFFECTIVE ASSISTANCE OF COUNSEL.

Defendant argues that the trial court erred by denying his motion for a new trial. We review a trial court's decision to grant or deny a motion for a new trial for an abuse of discretion. *People v Powell*, 303 Mich App 271, 277; 842 NW2d 538 (2013). An abuse of discretion is found when the trial court's decision "falls outside the range of reasonable and principled outcomes." *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272 (2008). Defendant moved the trial court for a new trial on the basis of ineffective assistance of trial counsel; thus, in order to determine whether the trial court abused its discretion in denying defendant's motion, we must consider the merits of defendant's ineffective assistance of counsel claims.

The determination of whether a defendant has been deprived of the effective assistance of counsel presents a mixed question of fact and constitutional law. *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). Because no evidentiary hearing was held regarding trial counsel's alleged ineffectiveness, our review is limited to the record below. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise. *People v Seals*, 285 Mich App 1, 17; 776 NW2d 314 (2009). In order for ineffective assistance of counsel to justify reversal of an otherwise valid conviction, "a defendant must show that counsel's performance fell below an objective standard of reasonableness, and that the representation so prejudiced the defendant as to deprive him of a fair trial." *People v Pickens*, 446 Mich 298, 303; 521 NW2d 797 (1994).

Defendant advanced several allegations of ineffective assistance of counsel in his motion for a new trial. First, defendant argued that his counsel was ineffective for failing to send subpoenas to witnesses listed on the defense witness list, which allegedly resulted in only one witness besides defendant testifying in his defense. "Decisions regarding . . . whether to call or question witnesses are presumed to be matters of trial strategy." *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999). The witnesses were listed as potential defense witnesses. Defendant presented no evidence that his trial counsel failed to evaluate these witnesses' potential testimony. We will not substitute our judgment for that of defense counsel under these circumstances. *Id*. at 77. Further, defendant provides no explanation of how the testimony of the other witnesses would have benefitted his defense. Therefore, because defendant fails to overcome the presumption that counsel's actions constituted sound trial strategy, counsel was not ineffective in this regard. See *Pickens*, 446 Mich at 303.

Next, defendant claimed that his trial counsel was ineffective for failing to admit (1) medical records establishing that he had MRSA as opposed to burn marks on his face; and (2) a "computer log" showing his activity for the time period between Main's 911 telephone call and when the police responded to his residence. Decisions regarding what evidence to present are also presumed to be matters of trial strategy. *Rockey*, 237 Mich App at 76. The jury heard testimony from defendant with respect to both of these pieces of evidence; the evidence would at most have simply corroborated defendant's testimony. Defendant also presented no evidence regarding the content of the medical records or the computer log in support of his contention that they would contradict aspects of Rought's testimony. Defendant fails to overcome the presumption that counsel's decision not to present this evidence was sound trial strategy. See *id*. Moreover, defendant fails to explain how either piece of evidence would have actually impacted

the outcome of his trial. Accordingly, counsel was not ineffective for failing to present this evidence.

Next, defendant argued that counsel was ineffective for failing to raise a conflict of interest claim. Defendant was previously represented by the current, elected Prosecuting Attorney, Jeffrey Getting, in a 2004 case involving methamphetamine. Defendant fails to provide any indication of how Getting's representation in his 2004 case affected the trial in this case (in which the People were represented by an assistant prosecutor). The cases are unrelated; the only similarity was the involvement of methamphetamine. This case is unlike *People v Davenport*, 280 Mich App 464, 468-471; 760 NW2d 743 (2008), in which counsel's performance was held objectively unreasonable for failing to raise a conflict of interest claim when the defendant's former counsel, who had represented the defendant in the *same* matter during the preliminary examination, accepted a position at the prosecutor's office before the defendant's trial. Because Getting's representation of defendant occurred approximately 10 years before this case in an unrelated matter, counsel was not ineffective for failing to raise a conflict of interest claim.

Defendant also claimed that counsel was ineffective for failing to challenge the legality of the search warrant obtained to search his residence. This claim is without merit because defense counsel did, in fact, challenge the search warrant in a pretrial motion to suppress. Defendant has thus not established the factual predicate for his claim. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

Next, defendant claimed that counsel was ineffective for failing to challenge the pat-down search of defendant on the grounds that it was not performed until 20 minutes after the officers had made initial contact with defendant. This claim is without merit. A pat-down search is proper if an officer has reasonable suspicion that the individual to be searched is armed. *People v Custer*, 465 Mich 319, 328; 630 NW2d 870 (2001). To demonstrate reasonable suspicion, "an officer must have specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrant the intrusion." *Id*. (citation and quotation omitted). A pat-down search may be conducted "where nothing in the initial stages of the encounter serves to dispel [the officer's] reasonable fear for his own or others' safety." *Terry v Ohio*, 392 US 1, 30; 88 S Ct 1868; 20 L Ed 2d 889 (1968) Thus, contrary to defendant's argument, the law imposes no time restriction on when an officer may conduct a limited pat-down search if he has the requisite reasonable suspicion that the individual may be armed. See *Custer*, 465 Mich at 328; *Terry*, 392 US at 30. Here, the officers were told that Main had heard what she believed to be a gunshot or loud explosion coming from defendant's residence. Defendant was evasive toward the officers when they arrived. Therefore, the pat-down search was based on the officers' reasonable suspicion that defendant may have been armed. Defense counsel was not ineffective for failing to raise this futile challenge. See *People v Thomas*, 260 Mich App 450, 457; 678 NW2d 631 (2004).

Next, defendant argued that counsel was ineffective for failing to move to suppress statements that defendant made, allegedly in violation of his *Miranda* rights.[5] However, defendant does not explain which statements he believes were made in violation of his *Miranda* rights. Nevertheless, considering the circumstances surrounding statements defendant made to police during his interaction with them, we find that *Miranda* warnings were not necessary because defendant was not subject to custodial interrogation. See *People v Ish*, 252 Mich App 115, 118; 652 NW2d 257 (2002). Defendant was in his home at the time he made the incriminating statements. "Interrogation in a suspect's home is usually viewed as noncustodial." *People v Coomer*, 245 Mich App 206, 220; 627 NW2d 612 (2001). "[A] police officer may ask general on-the-scene questions to investigate the facts surrounding the crime without implicating the holding in *Miranda*." *Ish*, 252 Mich App at 118. This conclusion is further supported by the fact that once the officers decided to obtain a search warrant to search defendant's residence, the officers told defendant that he was free to leave (and he in fact did leave). Therefore, defense counsel was not ineffective for failing to move to suppress defendant's statements under *Miranda* because such a motion would have been futile. See *Thomas*, 260 Mich App at 457.

Next, defendant claimed that counsel was ineffective for failing to "adequately explore" the initial search of defendant's residence that the officers conducted to verify that there was no one injured inside. Defendant does not contend that this search was improper, but rather highlights the fact that the officers did not smell or see anything in plain view during this search. Although it is unclear what particular actions defendant believes his counsel should have taken, there is nothing in the record supporting a finding that defense counsel was ineffective with respect to this evidence. Defense counsel emphasized during her closing argument that defendant's residence was orderly and that there were no signs of a fire or explosion during the initial search. Accordingly, this claim of ineffective assistance of counsel is also without merit.

Defendant additionally argued that counsel was ineffective for failing to emphasize to the jury a discrepancy in Rought's testimony concerning whether the officers took fingerprints from a garbage bag found in defendant's vehicle. Rought testified at trial that he did not attempt to fingerprint the items in the garbage bag; however, at the preliminary examination, Rought had testified that he tried to lift fingerprints off some items in the garbage bag but was unsuccessful. Defense counsel questioned Rought at trial with respect to this conflicting testimony. Defendant fails to explain how further emphasis on this conflicting testimony would have impacted the outcome of his trial. Therefore, counsel was not ineffective in this regard. *Pickens*, 446 Mich at 303.

Next, defendant claims that counsel was ineffective due to his counsel's failure to preserve evidence that was lost, destroyed, or not obtained that allegedly could have proven defendant's innocence. Again, the decision of what evidence to present is presumed to be a matter of trial strategy. *Rockey*, 237 Mich App at 76. First, defendant argues that trial counsel caused to become lost or destroyed cigarette butts found in the garbage bag that could have been tested for a potential DNA sample. Rought testified that there was other trash among the

---

[5] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

components of methamphetamine manufacture found in the garbage bag. However, even if the bag did contain cigarette butts, and the cigarette butts did test positive for someone else's DNA, the fact remains that the garbage bag was found in defendant's vehicle. Defendant's conviction did not require him to be the sole possessor of the components of methamphetamine manufacture, see *People v Wolfe*, 440 Mich 508, 519-520; 489 NW2d 748, mod 441 Mich 1201 (1992). With respect to the white T-shirt with red stains that was found in defendant's residence, defense counsel highlighted the fact that no testing was done on this shirt to confirm the nature of the substance that had caused the stains. Finally, with respect to counsel's supposed failure to interview the other residents of defendant's house, defendant fails to offer any explanation as to how their testimony would have favorably impacted his trial. Accordingly, defendant has not met his burden of proving that counsel was ineffective regarding this evidence. *Pickens*, 446 Mich at 303.

Finally, defendant argued that counsel was ineffective for failing to mention that several items commonly used in the manufacturing of methamphetamine were not found at defendant's residence. However, defense counsel did highlight this fact during her closing argument and during her questioning of Rought. Therefore, defendant has not established a factual predicate for his claim. See *Hoag*, 460 Mich at 6.

Because we find no merit to any of defendant's ineffective assistance of counsel claims, the trial court did not abuse its discretion in denying defendant's motion for a new trial. See *Powell*, 303 Mich App at 277. Further, defendant was not entitled to a *Ginther* hearing, because none of the foregoing claims required the record to be developed further, and defendant's claims are not of the type "in which further elucidation of the facts might advance his position." See *People v McMillan*, 213 Mich App 134, 142; 539 NW2d 553 (1995).

## III. FOURTH AMENDMENT CHALLENGES

Defendant also advances a Fourth Amendment argument on appeal, challenging the officers' pre-search warrant entry into his home. This issue was not properly presented for appeal because defendant did not raise this issue in his statement of questions presented. *People v Anderson*, 284 Mich App 11, 16; 772 NW2d 792 (2009). Regardless, we have reviewed the merits of defendant's Fourth Amendment claims and find them to be without merit.

The Fourth Amendment of the United States Constitution and the corresponding provision in the Michigan Constitution guarantee the right to be free from unreasonable searches and seizures. US Const, Am IV; Const 1963, art 1, § 11. Evidence seized during an unconstitutional search is generally barred from introduction at trial. See *People v Hawkins*, 468 Mich 488, 498-499; 668 NW2d 602 (2003). Here, however, all evidence seized from defendant's residence was seized pursuant to a search warrant, the validity of which defendant does not challenge on appeal. Officers testified that they did not discover or seize any items during their initial walkthrough, nor was the issuance of the search warrant grounded on any

observations made by the officers during the walkthrough. Therefore, we need not discuss in detail defendant's arguments concerning whether an exception to the warrant requirement applied to the officers' initial walkthrough.

Affirmed.

/s/ Deborah A. Servitto
/s/ Jane M. Beckering
/s/ Mark T. Boonstra