*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JA-JUAN JULIANO JENNINGS,

Defendant-Appellant.

UNPUBLISHED
October 1, 2019

No. 343424
Wayne Circuit Court
LC No. 17-000125-01-FC

Before: O'BRIEN, P.J., and BECKERING and LETICA, JJ.

PER CURIAM.

Following a six-day trial, a jury convicted defendant, Ja-Juan Juliano Jennings, a juvenile at the time, of first-degree felony murder, MCL 750.316(1)(b), and armed robbery, MCL 750.529, under theories of aiding and abetting. After the trial, the prosecution moved to set aside the first-degree murder conviction in the interest of justice if defendant pleaded guilty to second-degree murder, MCL 750.317, agreed to a term-of-years prison sentence, and complied with other terms and conditions set forth in an agreement for special consideration. The court granted the prosecution's motion, and defendant pleaded guilty to second-degree murder. The court sentenced defendant to concurrent prison terms of 17 to 60 years for second-degree murder and 17 to 60 years for armed robbery. Defendant appeals as of right his conviction for armed robbery. We affirm.

## I. RELEVANT FACTS

This case arises from a shooting and robbery that occurred on July 6, 2015, around 9:30 p.m., on Van Dyke Avenue in Detroit, Michigan. The following account of the incident derives from testimony presented at defendant's trial. The victim, Devin Guidry, and his cousin, Julian Croom, walked eastward on Lantz Street until it intersected with Van Dyke Avenue, and then started walking north on Van Dyke, in the direction of East Outer Drive. Croom testified that Guidry was wearing a pair of popular Cartier glasses that drew attention from people driving past them. Croom said he told Guidry to take the glasses off, but Guidry ignored him and continued walking and looking at his cell phone.

About a block west of Van Dyke Avenue, near the intersection of Lantz and Stotter streets, Croom had noticed what turned out to be defendant and Anthony Walker following them. Walker was wearing a hoodie, with the hood up and his hand in the pocket, and he and defendant were "power walking" toward Guidry and Croom. When the two men caught up with Croom and Guidry, Walker pulled out a gun and shot Guidry in the head at close range. Guidry collapsed to the ground and his glasses came off. Defendant grabbed the glasses, and he and Walker fled the scene together. Croom said he ran back to Guidry's house, calling 9-1-1 as he ran, and then returned to the scene with Guidry's brother. An ambulance took Guidry to the hospital, where medical personnel pronounced him dead on arrival.

John Mitchell, a detective with the Detroit Police Department and the officer in charge of investigating Guidry's murder, read a statement he had obtained from defendant into the record. According to defendant's account of the incident, he and Walker were walking behind Guidry and Croom on Van Dyke Avenue. Guidry looked back and Walker saw his glasses. As they caught up with Guidry and Croom, defendant heard Croom say, "Watch out." Then, Walker pulled out his gun and shot Guidry, who fell to the ground. Walker told defendant to grab the glasses, and he did. They then ran from the scene to a vacant house. Defendant told Walker that the glasses were not genuine Cartier's, whereupon Walker broke the glasses and threw them down. Walker then threatened to harm defendant if defendant told on him. Defendant said he did not call the police because he was afraid they would lock him up. Mitchell testified that, sometime after defendant gave this statement, defendant informed Mitchell that Walker told him he had a gun while they were walking.

Also introduced into evidence were three video clips from security cameras of nearby businesses that showed the incident unfold. Detroit Police Department Sergeant Steven Ford testified that the videos showed the actual speed at which events happened. In other words, the video recordings did not speed up or slow down the images. During the trial, the jury saw the clips in their entirety three times. Among other things, the third clip, the one from the business closest to the shooting, showed that defendant put on his sunglasses less than a minute before he and Walker caught up with Guidry and Croom.

II. ANALYSIS

Defendant argues that the evidence was insufficient to convict him of armed robbery under an aiding and abetting theory because the prosecution failed to establish the requisite intent. We disagree.

This Court reviews a challenge to the sufficiency of the evidence de novo. *People v Hawkins*, 245 Mich App 439, 457; 628 NW2d 105 (2001). The evidence is reviewed "in a light most favorable to the prosecutor to determine whether any trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt." *People v Robinson*, 475 Mich 1, 5; 715 NW2d 44 (2006). The standard this Court uses to review sufficiency of the evidence is "not whether there was any evidence to support the conviction but whether there was sufficient evidence to justify a rational trier of fact in finding guilt beyond a reasonable doubt." *People v Hampton*, 407 Mich 354, 365; 285 NW2d 284 (1979). When reviewing the evidence, factual conflicts are to be viewed in a light most favorable to the prosecution. *People v Wolfe*, 440 Mich 508, 515; 489 NW2d 748 (1992), amended 441 Mich 1201 (1993). Furthermore, it is up to the

jury to weigh the evidence presented, and evaluate the credibility of witnesses. See *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008).

The jury convicted defendant of armed robbery under a theory of aiding and abetting. A defendant is guilty of aiding and abetting when

> (1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement. [*People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010) (quotation marks and citation omitted).]

MCL 767.39 provides that "[e]very person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, aids, or abets in its commission may hereafter be prosecuted, indicted, tried and on conviction shall be punished as if he had directly committed such offense." "[Aiding and abetting] includes all words or deeds that may support, encourage, or incite the commission of a crime." *People v Wilson*, 196 Mich App 604, 614; 493 NW2d 471 (1992). However, "[m]ere presence, even with knowledge that an offense is about to be committed or is being committed, is not enough to make a person an aider or abettor; nor is mere mental approval, passive acquiescence or consent sufficient." *People v Turner*, 125 Mich App 8, 11; 336 NW2d 217 (1983).

Defendant does not dispute that the prosecution established the first two elements of aiding and abetting an armed robbery beyond a reasonable doubt. The evidence presented at trial showed that Walker was the principal perpetrator of the armed robbery. He possessed a weapon and used violence against Guidry during the course of committing a larceny.[1] The evidence also establishes beyond a reasonable doubt that defendant helped Walker commit the armed robbery when he followed Walker's instructions to grab Guidry's glasses and then fled with Walker to a vacant house. However, defendant disputes the third element necessary to prove that he committed armed robbery as an aider and abettor, arguing that the evidence presented at trial was insufficient to prove beyond a reasonable doubt that he intended the commission of armed

---

[1] The elements of armed robbery are:

> (1) the defendant, in the course of committing a larceny of any money or other property that may be the subject of a larceny, used force or violence against any person who was present or assaulted or put the person in fear, and (2) the defendant, in the course of committing the larceny, either possessed a dangerous weapon, possessed an article used or fashioned in a manner to lead any person present to reasonably believe that the article was a dangerous weapon, or represented orally or otherwise that he or she was in possession of a dangerous weapon. [*People v Chambers*, 277 Mich App 1, 7; 742 NW2d 610 (2007) (footnote omitted).]

robbery or knew that Walker intended to commit armed robbery when he (defendant) took Guidry's glasses and fled. He contends that nothing in his statement to Detective Mitchell suggested that he knew beforehand that Walker intended to rob, shoot, or assault Guidry, and that the was merely present when Walker committed the crime.

Circumstantial evidence and reasonable inferences arising from the evidence are sufficient to prove the elements of a crime. *People v Lane*, 308 Mich App 38, 58; 862 NW2d 446 (2014). "[B]ecause it can be difficult to prove a defendant's state of mind on issues such as knowledge and intent, minimal circumstantial evidence will suffice to establish the defendant's state of mind, which can be inferred from all the evidence presented." *Kanaan*, 278 Mich App at 622. Factors that may be considered in determining the state of mind of an aider and abettor "include a close association between the defendant and the principal, the defendant's participation in the planning and execution of the crime, and evidence of flight after the crime." *People v Carines*, 460 Mich 750, 758; 597 NW2d 130 (1999).

After thorough review of the record, we are convinced that the prosecution presented sufficient evidence that, if believed, would "justify a rational trier of fact in finding guilt beyond a reasonable doubt." *Hampton*, 407 Mich at 365. Detective Mitchell testified that defendant knew Walker had a gun before the shooting and robbery occurred because Walker told him so while the two men were walking. Croom testified that Guidry's glasses were popular, sought after, and recognizable as Cartier's, and defendant said in his statement that Walker saw Guidry's glasses when Guidry looked back toward them. Croom's testimony indicated that it was obvious that defendant and Walker were following them, and Croom said they were "power walking" to catch up with him and Guidry. Walker wore his hoodie over his head on a hot July night, and less than a minute before reaching Guidry and Croom, defendant donned sunglasses, even though it was nearly 9:30 at night. Immediately upon catching up with them, Walker shot Guidry, defendant grabbed his glasses, and Walker and defendant fled together to a vacant house, where defendant inspected the glasses and determined that they were not genuine Cartier glasses.

A jury that believed this testimony might reasonably infer that defendant knew that genuine Cartier glasses were valuable, and that Walker thought Guidry's glasses were genuine, wanted them, and intended to take them. The jury might also reasonably infer that defendant knew that, in the likely event that Guidry resisted the loss of his valuable glasses, Walker had a gun and was prepared to use it to take the glasses by force or threat of violence. Considering Croom's testimony about the value and desirability of the glasses, the jury might reasonably infer that defendant anticipated that Guidry would not hand over the glasses without at least the threat of force or violence. That defendant continued to accompany Walker and sped up with Walker to catch Guidry and Croom supports the reasonable inference that, aware of Walker's plan to take the glasses, by force if necessary, defendant elected to support him in the scheme. That defendant put on sunglasses about a minute before making contact with Guidry and Croom gives rise to two reasonable inferences. First, defendant had time to change his mind and break off his pursuit of Guidry and Croom, but he chose to participate in the scheme. Second, knowing that a crime was about to be committed, defendant took measures to avoid recognition.

Fleeing with Walker after the shooting and robbery further supports the jury's reasonable inference that defendant and Walker acted in concert. See *Carines*, 460 Mich at 758 (a jury may

-4-

consider flight from the crime in determining the state of mind of an aider and abettor). Giving the glasses to Walker after reaching the safety of the vacant building and informing him that they were not genuine Cartier glasses further supports the reasonable inference that defendant knew Walker thought the glasses were genuine, wanted them, and intended to take them. Watching the video clips of the incident three times allowed the jury multiple opportunities to observe and draw reasonable inferences from defendant's actions and body language. Further, to the extent that a close association of the principal and the aider and abettor is evidence of the latter's state of mind, *id.*, the jury heard testimony from an expert in cell phone analysis that defendant and Walker were in close and repetitive contact the day of the incident and for months thereafter.

Contrary to defendant's contention on appeal, the prosecutor presented more than minimal evidence of defendant's state of mind. See *Kanaan*, 278 Mich App at 622. As the foregoing shows, the evidence was sufficient to allow the jury to conclude beyond a reasonable doubt that defendant was not merely present during the robbery. See *Turner*, 125 Mich App at 11. The evidence presented at trial supported the reasonable inference that, at the very least, defendant knew Walker intended the armed robbery of Guidry at the time defendant gave Walker aid and encouragement. See *Bennett*, 290 Mich App at 472.

Defendant challenges the prosecutor's assertion during closing argument that defendant's act of putting on sunglasses shortly before making contact with Guidry and Croom established that he knew a crime was about to occur and attempted to conceal his identity. Defendant argues that the prosecutor's statement was mere speculation, and that speculation does not rise to the level of establishing proof beyond a reasonable doubt. However, it is not unusual for robbers to attempt to hide their facial features with sunglasses. See e.g., *People v Davis*, 277 Mich App 676, 678; 747 NW2d 555, judgment vacated in part and lv den in part 482 Mich 978 (2008); *People v Coomer*, 245 Mich App 206, 221-222; 627 NW2d 612 (2001). Further, "[i]t is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine what weight to be accorded those inferences." *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002). Moreover, even if we agreed with defendant's characterization of the prosecutor's inference, the trial court's instructions would have cured any alleged error regarding the prosecutor's comment or suggestion. *People v Mahone*, 294 Mich App 208, 212; 816 NW2d 436 (2011) ("Jurors are presumed to follow their instructions, and it is presumed that instructions cure most errors."). The court charged the jury with deciding what the facts of the case were and instructed it to consider and base its decision only on the evidence properly admitted at trial and that the attorneys' arguments were not evidence. These instructions adequately cured any improper comment by the prosecutor. *Id*.

Affirmed.

/s/ Colleen A. O'Brien
/s/ Jane M. Beckering
/s/ Anica Letica