PEOPLE v COOMER

Docket No. 208849. Submitted November 13, 2000, at Detroit. Decided
    April 6, 2001, at 9:00 A.M. Leave to appeal sought.

    Anitra L. Coomer was convicted by a jury in the Oakland Circuit
    Court, Rudy J. Nichols, J., of first-degree premeditated murder,
    first-degree felony murder, and kidnapping for the kidnapping
    and murder of a woman. The defendant was sentenced to a term of life
    imprisonment without parole for each of the first-degree murder
    convictions and fifteen to sixty years' imprisonment for the kidnap-
    ping conviction. The defendant appealed.

    The Court of Appeals held:

    1. Evidence of an oral statement given to the police by the defen-
    dant at her apartment was properly admitted into evidence on the
    basis that the defendant was not in custody or otherwise deprived
    of her freedom when she gave the statement. The statement was
    voluntary and no Miranda warnings were required.

    2. The court properly suppressed the written statement made by
    the defendant at her apartment immediately after her oral state-
    ment. Miranda warnings were required for the written statement
    because the defendant had orally confessed to the crime, a custo-
    dial environment then existed, and the defendant neither received
    nor waived her constitutional rights before giving the written
    statement.

    3. The court did not err in denying the defendant's motion to sup-
    press her second oral statement, which was given at a police sta-
    tion after the previous oral and written statements had been made.
    The defendant was fully advised of her Miranda rights before mak-
    ing the second oral statement and waived those rights. The state-
    ment given at the police station was sufficiently disconnected from
    the prior written statement that the second oral statement cannot
    be considered to be fruit of the poisonous tree.

    4. The court properly instructed the jury that a person convicted
    as an aider and abettor is as guilty as, and may be punished the
    same as, the principal who directly committed the offense.

    5. Dual convictions of first-degree premeditated murder and first-
    degree felony murder arising out of the death of a single victim vio-
    late double jeopardy protections. The judgment of conviction and

sentence must be modified to specify that the defendant is convicted of and sentenced for one count of first-degree murder supported by two theories: premeditated murder and felony murder. The matter must be remanded to the trial court to amend the judgment accordingly. The single conviction and single sentence for first-degree murder, as modified, must be affirmed.

6. Convictions and sentences for both felony murder and the underlying felony of kidnapping violate double jeopardy protections. The conviction and sentence for the underlying felony must be vacated.

Affirmed in part, vacated in part, and remanded.

1. CRIMINAL LAW — DOUBLE JEOPARDY.

Dual convictions of first-degree premeditated murder and first-degree felony murder arising out of the death of a single victim violate double jeopardy protections; the proper remedy is to modify the judgment of conviction and sentence to specify that the defendant is convicted of and sentenced for a single count of first-degree murder supported by two theories: premeditated murder and felony murder (MCL 750.316).

2. CRIMINAL LAW — DOUBLE JEOPARDY.

Convictions of and sentences for both felony murder and the underlying felony of kidnapping violate double jeopardy protections; the proper remedy is vacation of the conviction and sentence for the underlying felony (MCL 750.316, 750.349).

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, *David Gorcyca*, Prosecuting Attorney, *Daniel L. Lemisch*, Chief, Appellate Division, and *Kathryn G. Barnes*, Assistant Prosecuting Attorney, for the people.

*William A. Wertheimer, Jr.*, for the defendant on appeal.

Before: COLLINS, P.J., and JANSEN and WHITBECK, JJ.

JANSEN, J. Following a jury trial, defendant was convicted of first-degree premeditated murder, MCL 750.316 first-degree felony murder, MCL 750.316, and kidnapping, MCL 750.349. Defendant was thereafter sentenced to two terms of life imprisonment without

parole for the first-degree murder convictions, and fifteen to sixty years' imprisonment for the conviction of kidnapping. Defendant appeals as of right. Because defendant's convictions arise out of the death of a single victim, we order that defendant's judgment of sentence be modified to specify that defendant's conviction and single sentence is for one count of first-degree murder supported by two theories: premeditated murder and felony murder. The underlying felony conviction and sentence for kidnapping are vacated.

I

Defendant was tried with her codefendant, McConnell Adams, Jr.,[1] before separate juries in the Oakland Circuit Court in October 1997. Their convictions arise from the highly publicized kidnapping and murder of Dr. Deborah Iverson, an ophthalmologist, shortly after she left her psychiatrist's office in the city of Birmingham on May 16, 1996. Dr. Iverson's vehicle was found the next day, parked in a rural area of Macomb County. Dr. Iverson's body was found inside the vehicle, and an autopsy revealed that she had been strangled to death. Further investigation revealed that two of Dr. Iverson's checks, totaling $1,300, had been cashed at the drive-through lanes of two banks on the morning of her disappearance. It was not until December 30, 1996, when police officers received a telephone call from an attorney representing an anonymous source, that the police discovered that defen-

---

[1] Our opinion in codefendant Adams' case is also being issued today. *People v Adams*, 245 Mich App 226; 627 NW2d 623 (2001). He was convicted of the same offenses as defendant.

dant and codefendant Adams were the perpetrators of the crime.

The evidence at trial established the following circumstances of this case. Defendant and codefendant Adams, who were never married, lived together with their two-year-old son in an apartment in the city of Clawson. On May 16, 1996, their rent was overdue, the apartment management had sent a seven-day notice demanding payment or to vacate the premises, and they owed $480 to their day-care provider.

Dr. Robert Iverson, who was married to Dr. Deborah Iverson, left their home at 7:00 A.M. on May 16, 1996, at about the time that their younger son's babysitter, Evelyn Watson, arrived at the house. Deborah Iverson drove her older son to school at 7:45 A.M., informing Watson that she would be returning home at about 10:00 A.M. Deborah Iverson had an appointment at 9:00 A.M. with a psychiatrist, whose office was located in downtown Birmingham. She left the office at 9:45 A.M. In the meantime, defendant and codefendant Adams dropped off their son with their day-care provider in Madison Heights at about 9:30 A.M. The day-care provider's home is about a fifteen-minute drive from downtown Birmingham.

Deborah Iverson did not return home at 10:00 A.M, and when her son's class let out at 12:30 P.M., the school called the Iverson home and told Watson that Deborah Iverson had not picked up the child. Watson attempted to call Deborah Iverson on her cellular telephone, but did not receive an answer. Watson then picked up the child herself and called Robert Iverson. He arrived home at about 1:30 P.M. and also tried to call Deborah Iverson on her cellular telephone, but did not receive an answer. He also called

her office and was told that she had not shown up there. He discovered that she had left the psychiatrist's office after her scheduled appointment. Robert Iverson then telephoned the police to report that his wife was missing.

At about 5:00 P.M. on May 16, 1996, Ernest Sampson noticed a green Toyota Land Cruiser on the side of Snell Road while driving in Washington Township. Sampson again noticed the same vehicle the following morning and recognized that the license plate on the vehicle corresponded to that of a vehicle belonging to a woman reported as missing on the radio. Sampson stopped and looked inside the vehicle and saw a body lying facedown on the floor in the back seat. Sampson called the police, who arrived shortly thereafter. The police found blood on the right side of Deborah Iverson's face and a line or mark on her neck. Her black and white jacket was missing a large square piece. Some spots on her jacket were faded and there were a couple of faded spots on the back seat of the vehicle. She was clutching a picture of one of her sons in her hand. The police also noticed footprints around the vehicle.

The medical examiner performed an autopsy on May 17, 1996, and testified that Deborah Iverson had been dead for at least twenty-four hours at that time. The cause of death was ligature strangulation, which involved the use of some sort of noose around her neck, such as a belt. The medical examiner also testified that the ligature pattern indicated that there may have been a struggle, that the strangulation was not quick, and that it may have been agonizing.

The police investigation later discovered that some checks drawn on the Iversons' account at Michigan

National Bank had been cashed on the day of the kill-
ing. A bank teller at the drive-through lane of one of
the branches testified that at about 10:00 A.M. on May
16, 1996, a white female customer with blond hair
submitted a check for $1,000 made out to "cash." The
teller did not see anyone else in the vehicle. The
check, however, had not been signed on the back,
and the teller sent the check back for a signature and
for a driver's license. The check was returned to the
teller with a signature on the back and with Deborah
Iverson's license. During the trial, Robert Iverson tes-
tified that while the writing on the front of the check
was that of his wife, the signature on the back of the
check was not in her handwriting. The teller cashed
the check and the time of the transaction was 10:08
A.M. A second bank teller at a different branch also
testified that at about 11:00 A.M. on May 16, 1996, she
cashed a check for $300 made out to "cash." During
the trial, Robert Iverson again testified that the writ-
ing on the front of the check was in his wife's hand-
writing. He also stated that the endorsement on the
back was in her handwriting, but was "jittery." The
time of the second transaction was 11:04 A.M. Defen-
dant's fingerprints were ultimately found on both
checks.

On May 17, 1996, codefendant Adams paid their
overdue child-care bill of $480 in cash. The day-care
provider testified that Adams' left hand was bandaged
when he paid the bill. On May 18, 1996, defendant and
codefendant Adams paid $615 in overdue rent to the
apartment building owner.

It was not until December 30, 1996, that the police
discovered any new leads. On December 29, 1996,
defendant telephoned her friend Mark Dawson stating

that codefendant Adams had beaten her. Defendant was at the house of another friend, Anita Krawczyk. Dawson went to Krawczyk's house that afternoon, and defendant told him of the Iverson murder. Defendant told Dawson that she and codefendant Adams had originally planned to rob Deborah Iverson, but after cashing two of her checks, codefendant Adams strangled her with defendant's coat belt. Defendant and codefendant Adams then sprayed Deborah Iverson's body and the inside of the vehicle with bleach and burned her purse. Defendant told Dawson that she had not reported codefendant Adams' assault because he was holding the murder over her. Dawson testified that Krawczyk later called the police to report the assault. When the police arrived, defendant told the police that codefendant Adams had beaten her and left in a stolen truck.

As defendant and Krawczyk were driving to the Clawson police station to report the domestic assault, defendant told Krawczyk that she was worried about being arrested for the Iverson murder and that she and codefendant Adams had agreed that if they were ever caught, he would take all the blame so that one of them could remain free to raise their son. Shortly thereafter, codefendant Adams was arrested for domestic assault.

On December 30, 1996, Dawson's attorney contacted the Oakland County Sheriff's Department with information that defendant was involved in the Iverson murder. Dawson later met with two officers from the sheriff's department and told them what defendant had told him. Police officers then went to defendant's apartment later that night. At the apartment, defendant confessed her involvement in the Iverson

murder, stating that what began as a robbery culminated in Iverson's murder. After giving this oral statement, defendant prepared a written statement for the police. She then went with police officers to the Oakland County Sheriff's Department and gave another oral statement confessing her involvement in the Iverson murder. On December 31, 1996, police officers executed a search warrant at defendant's apartment and found her black leather coat with belt loops, but no belt, and a spray bottle of bleach with the Arbor name brand under the sink.

Krawczyk testified during the trial that she has known defendant and codefendant Adams for many years. Krawczyk testified that a few days after the killing, she was at defendant's apartment watching television and saw several news reports about Iverson's murder. Each time a news report came on, defendant would turn up the volume, and when the story was over, defendant would turn the news off. Krawczyk asked defendant why she was so interested in the news reports, and defendant responded that she and codefendant Adams had "done that." Krawczyk did not take defendant seriously. However, in October or November 1996, while watching news reports of the Iverson case, defendant again told Krawczyk, in the presence of defendant's mother, that she and codefendant Adams "were the ones that [the police] were looking for."

Krawczyk also testified that another time in 1996, she and defendant were talking about the Iverson case. Defendant stated that she and codefendant Adams had planned to snatch a purse that day, and that they drove to a parking lot in Birmingham where codefendant Adams "opened his passenger door, just

enough so the lady could not get into the car" and then pushed the lady into her vehicle. After driving around and cashing a couple of Iverson's checks, they stopped for cigarettes and defendant's name was mentioned in front of Deborah Iverson. Defendant stated that she then understood that Deborah Iverson was going to die. After defendant and codefendant Adams went to an Arbor Drugs store to buy bleach to clean off fingerprints, defendant gave codefendant Adams her coat belt. Defendant then went into the drug store, and when she returned to the vehicle, codefendant Adams told her to drive, turn the music up loud, and not look back.

At the trial, there was also evidence presented that at 11:09 A.M. on May 16, 1996, Birmingham parking lot enforcement officer Anita Gomez issued a parking ticket in municipal parking lot number seven to a vehicle that was registered to defendant.

Defendant testified during the trial on her own behalf. She testified that while she and codefendant Adams planned to rob a woman, she did not expect anyone to get hurt and that codefendant Adams made all the decisions. She testified that codefendant Adams noticed the Land Cruiser and told her to park next to it. Codefendant Adams checked the parking meter where the Land Cruiser was parked, looked inside the vehicle, and told defendant that he knew a woman was driving the Land Cruiser because of certain items he saw in it. They sat in their car and codefendant Adams noticed a woman walking toward the Land Cruiser. He placed a BB gun to Deborah Iverson's back and forced her into the Land Cruiser. According to defendant, when codefendant Adams asked for her belt, he said that he was just going to

tie up Deborah Iverson. After giving him the belt, defendant went into the Arbor Drugs store. When she returned to the vehicle, she did not look in the back seat. When she stopped at a stop sign, defendant looked in the rearview mirror and saw that codefendant Adams was no longer kneeling over Deborah Iverson on the floor, but was sitting in the back seat. Defendant claimed that she began to cry when codefendant Adams said, "Anitra, it's done. It's over."

According to defendant, codefendant Adams then told her to drive home, which she did. He went to their apartment and eventually got his pickup truck. In the meantime, defendant waited for him behind a store. They met and drove out to Macomb County and left Deborah Iverson in her vehicle on Snell Road.

II

Defendant first argues that the trial court erred in not suppressing her statements given to the police in her apartment. There are two separate statements that were given to police officers at defendant's apartment: an oral statement and a subsequent written statement made by defendant. Defendant argues that the statements should have been suppressed because she was not given any *Miranda*[2] warnings before giving the statements. The trial court ultimately ruled that there was no custodial interrogation regarding the oral statement; thus, *Miranda* warnings were not required. The trial court did, however, suppress the written statement that immediately followed the oral

---

[2] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

statement, finding that *Miranda* warnings were required and that the failure of the police officers to inform defendant of her constitutional rights required suppression of the written statement.[3] For the reasons hereafter set forth, we affirm the trial court's ruling that admitted the oral statement made at the apartment.

The circumstances surrounding the taking of the statements were the subject of a pretrial *Walker*[4] hearing. The evidence at the hearing showed that on December 30, 1996, the Oakland County Sheriff's Department received information that defendant and codefendant Adams were involved in the murder of Deborah Iverson. Two officers from the sheriff's department interviewed Dawson, and one, Officer William Kucyk, later went to defendant's apartment. At 11:45 P.M., officers from the Oakland County Sheriff's Department, the Macomb County Sheriff's Department, and the Clawson Police Department arrived at defendant's apartment. There were two marked and three unmarked police vehicles parked on the street in front of the apartment building. Officer Robert Hannah of the Clawson Police Department, who had had contact with defendant on previous occasions on other matters related to domestic assault and a complaint about a stolen vehicle, first contacted defendant at the apartment on the intercom system. Kucyk and Officer Mark Sanborn, of the Macomb County Sheriff's Department, accompanied

---

[3] At trial, for strategic purposes, defendant withdrew her objection to the written statement and requested that it be admitted, which it was. On appeal, defendant argues that both the oral and written statements should have been suppressed.

[4] *People v Walker (On Rehearing)*, 374 Mich 331; 132 NW2d 87 (1965).

Hannah, and defendant allowed them to enter her apartment. Two other Clawson police officers stood outside defendant's apartment door.

Hannah told defendant that Kucyk and Sanborn wished to speak with her. Defendant indicated at the hearing that she recognized Kucyk from television reports and assumed that the officers were there to question her either about the stolen truck or about the Iverson matter, and she assumed that she was under arrest. Defendant stated that she would speak with the officers, allowed them to enter her apartment, but asked them to be quiet because her two-year-old son was asleep. Hannah then left the apartment.

Kucyk told defendant that he and Sanborn were present to talk with her, that she was not under arrest, and that if she wanted them to leave, they would go. Kucyk stated that he told defendant several times during their discussion that she was not under arrest. The officers stated that defendant, who was then twenty-one years old, appeared to be fine and did not appear to be tired or under the influence of drugs or alcohol, although defendant later claimed that she drank some alcohol and smoked some marijuana that evening. They all sat at the kitchen table and Kucyk indicated that he wanted to speak about Deborah Iverson. Kucyk stated that at that point, defendant became very shaken, nervous, concerned, and started to cry. Defendant then began to scream hysterically. She believed that she was under arrest and was not free to leave because there were two police officers in her apartment and other police officers in the hall. Defendant asked if she could get

her cigarettes from her bedroom, which she did, and proceeded to tell the officers what happened.

According to Kucyk, defendant started by saying that it might never have happened if a truck had blocked the view of the Birmingham police station. Kucyk asked her to tell them what she knew, and defendant told the police "the whole story." Kucyk stated that defendant told them that she never meant for Deborah Iverson to get hurt, and that what started out as a robbery ended with Iverson being killed and the vehicle abandoned. Defendant took about one-half hour to tell her story, and the police asked only a few questions. According to defendant, she had calmed down by the time she began to tell the officers what happened, although she cried off and on during her statement. She conceded that the oral statement was voluntary, and not compelled or coerced.

After defendant gave her oral statement, Kucyk asked if she would put it in writing, which she did, and she wrote a three-page statement. It took about twenty minutes for defendant to write the statement, and Kucyk left the apartment to talk with another officer and with the prosecutor's office, leaving Sanborn with defendant while she wrote the statement.

Following the hearing, the trial court ruled that defendant was not in custody or otherwise deprived of her freedom when she gave the oral statement and thus *Miranda* warnings were not necessary and that the statement was voluntarily given. However, the trial court ruled that *Miranda* warnings were required for the written statement because after defendant orally confessed to the crime, a custodial environ-

ment existed, and defendant neither received nor waived her constitutional rights before giving the written statement. "The ultimate question whether a person was 'in custody' for purposes of *Miranda* warnings is a mixed question of fact and law, which must be answered independently by the reviewing court after review de novo of the record." *People v Mendez*, 225 Mich App 381, 382; 571 NW2d 528 (1997), citing *Thompson v Keohane*, 516 US 99; 116 S Ct 457; 133 L Ed 2d 383 (1995). This is so because an "in-custody" determination calls for application of the controlling legal standard to the historical facts. *Id.* at 112-113. Findings concerning the circumstances surrounding the giving of a statement are factual findings that are reviewed for clear error. *Mendez*, *supra* at 382. A finding is clearly erroneous if, after reviewing the entire record, an appellate court is left with a definite and firm conviction that a mistake has been made. *Id.*

This Court has set forth the requirement of when *Miranda* warnings are necessary in *People v Zahn*, 234 Mich App 438, 449; 594 NW2d 120 (1999):

> It is well settled that *Miranda* warnings need be given only in situations involving a custodial interrogation. *People v Anderson*, 209 Mich App 527, 532; 531 NW2d 780 (1995). The term "custodial interrogation" means " 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of [her] freedom of action in any significant way.' " *People v Hill*, 429 Mich 382, 387; 415 NW2d 193 (1987), quoting *Miranda*, *supra* at 444. To determine whether a defendant was in custody at the time of the interrogation, we look at the totality of the circumstances, with the key question being whether the accused reasonably could have believed that [s]he was not free to leave. *People v Roark*, 214 Mich App 421, 423; 543 NW2d 23 (1995). The determination of custody depends on

the objective circumstances of the interrogation rather than the subjective views harbored by either the interrogating officers or the person being questioned. *Stansbury v California*, 511 US 318, 323; 114 S Ct 1526; 128 L Ed 2d 293 (1994).

We find that the trial court did not err in ruling that defendant was not in custody when she gave the oral statement at her apartment. The evidence showed that defendant permitted the police officers to enter her apartment building and permitted them to enter her apartment. "[I]nterrogation in a suspect's home is usually viewed as noncustodial." *People v Mayes (After Remand)*, 202 Mich App 181, 196; 508 NW2d 161 (1993) (CORRIGAN, P.J., concurring), citing *Beckwith v United States*, 425 US 341; 96 S Ct 1612; 48 L Ed 2d 1 (1976). The officers did not display weapons, and Kucyk indicated that he informed defendant several times that she was not under arrest. Kucyk also told defendant that if she wanted them to leave, they would go. Contrary to defendant's contention, her subjective belief that she was not free to leave (because Kucyk asked her about the Iverson murder) is not dispositive because an objective assessment of the totality of the circumstances indicates that she was not in custody or under arrest when she gave her oral statement. *Stansbury, supra* at 323-324. Defendant proceeded to give a statement, largely in narrative form, with little police questioning. She fully acknowledged that she was not compelled or coerced to give a statement.

Accordingly, the totality of the circumstances indicates that, for purposes of *Miranda*, defendant was not in custody at her apartment when she gave her oral statement; therefore, the trial court did not err in

denying defendant's motion to suppress her oral statement.

### III

Defendant also argues that the trial court erred in denying her motion to suppress her second oral statement given at the police station because a reasonable person would not have felt at liberty to terminate the second oral statement. She further argues that the statement given at the police station should have been suppressed as fruit of the poisonous tree.

The evidence at the hearing showed that after defendant gave her oral and written statements at her apartment, the police officers asked her if she would accompany them to the police station. Defendant agreed to do so and was allowed to arranged for the care of her son. At the police station, Kucyk told defendant that he wished to question her some more, and defendant was advised of her *Miranda* rights for the first time. Defendant waived her rights orally and in writing, signing the waiver form at 3:45 A.M. on December 31, 1996. Defendant declined an offer of food (although police officers had provided her with cigarettes and a soft drink on the way to the police station), and she was informed that she could stop and take a break when she wanted to do so.

At the police station, defendant gave a second incriminating oral statement. She repeated that the incident began as a robbery and ended with the killing of Deborah Iverson and the abandonment of her vehicle. Defendant added details that codefendant Adams placed a BB gun in Iverson's back, pushed Iverson into her vehicle, and that defendant was

wearing a red hat and sunglasses as a disguise. This oral statement lasted about thirty to forty-five minutes, and defendant acknowledged at the hearing that she waived her rights and spoke freely with the officers.

We find that the trial court did not err in denying defendant's motion to suppress the second oral statement given at the police station. Here, defendant was in custody at the police station, she was fully advised of her *Miranda* rights, and she waived those rights. Defendant's contention that a reasonable person would not have felt at liberty to terminate the second oral statement is simply not supported by the record. There is no indication that the second oral statement given at the police station was obtained illegally or involuntarily.

Further, although the written statement given at defendant's apartment should have been preceded by *Miranda* warnings, the second oral statement given at the police station was not fruit of the poisonous tree. Suppression of the oral statement given by defendant at the police station would not be appropriate absent a causal connection between that statement and the earlier, improperly obtained written statement. *People v Spinks*, 206 Mich App 488, 496; 522 NW2d 875 (1994), citing *People v Malach*, 202 Mich App 266, 274; 507 NW2d 834 (1993). Relevant factors include (1) the time lapse between the misconduct and the statement, (2) the flagrancy of the misconduct, (3) any intervening circumstances, and (4) any antecedent circumstances. *Spinks, supra* at 496.

Here, there was a time lapse of approximately three hours between the written statement made at the

apartment and the second oral statement at the police station. The written statement was made immediately after defendant gave a voluntary oral statement and there is no indication that the written statement was secured by coercive police conduct. At the police station, defendant was properly advised of her *Miranda* rights before giving her second oral statement. Under these circumstances, the statement given at the police station is sufficiently disconnected from the prior written statement that the later oral statement cannot be considered to be fruit of the poisonous tree.

IV

Defendant next argues that on the verdict form the trial court incorrectly gave the jury the option of finding her guilty of either the substantive offenses or aiding and abetting. Specifically, the verdict form explicitly asked the jury to decide whether defendant was "Guilty of First-Degree Premeditated Murder *or* Aiding and Abetting same." Defendant contends that there was no reason for the trial court to include the aiding and abetting language on the verdict form and that the jury might have construed aiding and abetting as a lesser included offense.

We find no error here. The verdict form properly reflected the law that one convicted as an aider and abettor is punished the same as the principal of the offense. MCL 767.39. Moreover, the trial court properly instructed the jury that "[a]nyone who intentionally assists someone else in committing a crime is as guilty as a person who directly commits it and can be convicted as an aider and abetter." See *People v Norris*, 236 Mich App 411, 419; 600 NW2d 658 (1999). Therefore, we cannot find any prejudice inuring to

defendant attributable to the language on the verdict form.

V

Lastly, defendant argues that her multiple convictions and sentences for first-degree premeditated murder, first-degree felony murder, and kidnapping arising out of the death of a single victim violate double jeopardy. The prosecution concedes that the judgment of sentence should be amended.

Where dual convictions of first-degree premeditated murder and first-degree felony murder arise out of the death of a single victim, the dual convictions violate double jeopardy. *People v Bigelow*, 229 Mich App 218, 220-222; 581 NW2d 744 (1998). The proper remedy is to modify the judgment of conviction and sentence to specify that defendant's conviction is for one count and one sentence of first-degree murder supported by two theories: premeditated murder and felony murder. *Id.* at 220-221. Likewise, defendant's convictions and sentences for both felony murder and the underlying felony of kidnapping violate her right against double jeopardy. *People v Gimotty*, 216 Mich App 254, 259; 549 NW2d 39 (1996). The proper remedy is to vacate the conviction and sentence for the underlying felony. *Id.* at 259-260.

Accordingly, the conviction and single sentence for first-degree murder, as modified, are affirmed. We remand to the trial court to amend the judgment of sentence to specify that defendant's conviction is for one count and one sentence of first-degree murder supported by two theories: premeditated murder and

felony murder. The conviction and sentence for kidnapping are vacated.

Affirmed in part, vacated in part, and remanded for proceedings consistent with this opinion. Jurisdiction is not retained.