# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JOHN EDWARD BARRITT,

Defendant-Appellant.

FOR PUBLICATION
August 9, 2018
9:00 a.m.

No. 341984
Genesee Circuit Court
LC No. 15-038244-FC

Before: BORRELLO, P.J., and M. J. KELLY and BOONSTRA, JJ.

BORRELLO, J.

The prosecution appeals by leave granted[1] the trial court's opinion and order, following remand from the Michigan Supreme Court, which granted defendant's motion to suppress statements made during a custodial interrogation without being advised of his *Miranda*[2] rights. For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

This case arises out of the death of Amy Wienski, defendant's alleged girlfriend. This matter was initially before this Court when the prosecution filed an interlocutory appeal of the trial court's decision to grant defendant's motion to suppress his statements, and this Court affirmed on different grounds. *People v Barritt*, 318 Mich App 662, 671; 899 NW2d 437 (2017), vacated in part by 501 Mich 872 (2017). The prosecution filed an application for leave to appeal this Court's prior decision in the Michigan Supreme Court, and in lieu of granting leave to appeal, the Michigan Supreme Court vacated the holding of this Court that defendant was "in custody." *People v Barritt*, 501 Mich 872; 901 NW2d 859 (2017). The Michigan Supreme Court determined that this Court properly concluded that when deciding whether defendant was "in custody," the trial court applied the wrong legal standards. Our Supreme Court remanded the matter to the trial court for application of those standards, stating:

---

[1] *People v Barritt*, unpublished order of the Court of Appeals, entered February 22, 2018 (Docket No. 341984).

[2] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

-1-

to determine, in light of all of the objective circumstances surrounding the interrogation: (1) whether a reasonable person would have felt that he was not at liberty to terminate the interrogation and leave; and (2) whether the environment presented the same inherently coercive pressures as the type of station house questioning involved in [*Miranda*]. See *Howes v Fields*, 565 US 499, 509; 132 S Ct 1181; 182 L Ed 2d 17 (2012); *Yarborough v Alvarado*, 541 US 652, 663; 124 S Ct 2140; 158 L Ed 2d 938 (2004); *People v Elliott*, 494 Mich 292, 308; 833 NW2d 284 (2013). [*Id.*]

On remand, the trial court granted defendant's motion to exclude his statements and suppressed the evidence finding defendant was "in custody" for purposes of *Miranda* and pursuant to the standards set forth in the Michigan Supreme Court order. This interlocutory appeal by the prosecution followed.

On appeal, the prosecution argues that the trial court erred when it granted defendant's motion to suppress his statements because defendant was not "in custody" for purposes of *Miranda*, and therefore, what the prosecution describes as his voluntary, uncoerced, noncustodial statements are admissible at trial. The prosecution argues that defendant was not "in custody" for *Miranda* purposes because he voluntarily agreed to accompany the police in a marked vehicle to the station, he voluntarily provided information about the victim, and the room where defendant was interviewed was unlocked with people coming and going, the interview only lasted 90 minutes, and defendant was told he could stop the interview, but he continued to speak.

## II. ANALYSIS

" 'The ultimate question whether a person was 'in custody' for purposes of *Miranda* warnings is a mixed question of fact and law, which must be answered independently by the reviewing court after review de novo of the record.' " *People v Coomer*, 245 Mich App 206, 219; 627 NW2d 612 (2001) (citation omitted). This Court reviews for clear error the trial court's factual findings concerning the circumstances surrounding statements to the police. *Id*. "A finding is clearly erroneous if, after reviewing the entire record, an appellate court is left with a definite and firm conviction that a mistake has been made." *Id*.

Every defendant has a constitutional right against self-incrimination. US Const, Am V; Const 1963, art 1, § 17. To effectuate this right, police must warn a defendant of his constitutional rights if the defendant is taken into custody for interrogation. *People v Cortez (On Remand)*, 299 Mich App 679, 691; 832 NW2d 1 (2013). Statements made by a defendant to the police during a custodial interrogation are not admissible unless the defendant waives his constitutional right against self-incrimination voluntarily, knowingly, and intelligently. *People v Tierney*, 266 Mich App 687, 707; 703 NW2d 204 (2005).

It is undisputed that defendant was not advised of his *Miranda* rights when he was questioned by the detectives. The issue now before this Court is whether defendant was "in custody" for *Miranda* purposes, and whether the statements he made to police are inadmissible due to the lack of *Miranda* warnings.

The Supreme Court has stated that "custody" is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of "the objective circumstances of the interrogation," *Stansbury v California*, 511 US 318, 322-323, 325, 114 S Ct 1526, 128 L Ed 2d 293 (1994), a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v Keohane*, 516 US 99, 112, 116 S Ct 457, 133 L. Ed. 2d 383 (1995); *Fields*, 565 US at 509. Further, we have been instructed by the Supreme Court that in order to determine how a suspect would have "gauge[d]" his "freedom of movement," courts must examine "all of the circumstances surrounding the interrogation." *Stansbury*, 511 US at 322, 325. The Supreme Court has listed relevant circumstances as: (1) the location of the questioning, see *Maryland v Shatzer*, 559 US 98, 105-106, 130 S Ct 1213, 175 L Ed 2d 1045 (2010); (2) the duration of the questioning, *Berkemer v McCarty*, 468 US 420, 437-438, 104 S Ct 3138, 82 L Ed 2d 317 (1984); (3) statements made during the interview, *Oregon v Mathiason*, 429 US 492, 495; 97 S Ct 711; 50 L Ed 2d 714; *Yarborough v Alvarado*, 541 US 652, 665, 124 S Ct 2140, 158 L Ed 2d 938 (2004); *Stansbury*, 511 US at 325; (4) the presence or absence of physical restraints during the questioning, *New York v Quarles*, 467 US 649, 655, 104 S Ct 2626, 81 L Ed2d 550 (1984); and (5) the release of the interviewee at the end of the questioning, *California v Beheler*, 463 US 1121, 1122-1123; 103 S Ct 3517, 77 L Ed2d 1275 (1983) (as quoted in *Fields*, 565 US at 509). All cases stress that no one circumstance is controlling, rather a reviewing Court must look to the totality of the circumstances when deciding whether an individual was subjected to custodial interrogation under *Miranda*. *Fields*, 565 US at 516. Hence, we begin our analysis by going through each of the circumstances set forth in Supreme Court case law to determine whether defendant was subjected to custodial interrogation. *Fields*, 565 US at 509-510.

## A. LOCATION

In this case the trial court found, and the parties agreed, that defendant was questioned at a police station. From the descriptions provided by the questioning officers and from what can be gleaned from the taped interview, questioning of defendant took place in a small police office located within a larger governmental building in Homer, MI. The trial court described it as a "satellite office of the Calhoun County Sheriff's Department." A police station is a "police-dominated atmosphere" as contemplated by *Miranda*. *Miranda*, 384 US at 445. However, in *Oregon v Mathiason*, 429 US 492, 494-496, the Supreme Court reversed the Oregon Supreme Court's finding that because defendant's questioning had taken place in a police station, the interrogation took place in a coercive environment and defendant was therefore subjected to custodial interrogation. In *Mathiason*, the defendant had been suspected in a burglary. Officers attempted to make contact with defendant, eventually leaving their card and requesting that defendant call them, which he did. When defendant called, the officer asked where defendant would like to meet and after defendant, offering no preference, the officer suggested the state patrol office. Defendant met there with the officer who, on arrival, told defendant he was not under arrest, but that defendant should be truthful. Defendant confessed after being (wrongfully) told by the officer that his fingerprints were found at the scene. In reversing the Oregon Supreme Court's finding that defendant was subjected to custodial interrogation the Supreme Court held:

In the present case, however, there is no indication that the questioning took place in a context where respondent's freedom to depart was restricted in any way. He came voluntarily to the police station, where he was immediately informed that he was not under arrest. At the close of a 1/2-hour interview respondent did in fact leave the police station without hindrance. It is clear from these facts that Mathiason was not in custody "or otherwise deprived of his freedom of action in any significant way."

Such a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was *that* sort of coercive environment to which Miranda by its terms was made applicable, and to which it is limited. *Mathiason*, 429 US at 495.

In this case, the trial court acknowledged that based on *Mathiason*, the fact that interrogation occurred at a police station is not dispositive while also finding:

Still, the location of the questioning in the instant case weighs in favor of a finding that Defendant was in custody. Police officers have an inherent authority that generally elicits respect from the public. The average person that is summoned to a police station to talk with a detective would not feel comfortable leaving the station until the discussion was terminated by that detective. In this case, Defendant was taken to the station house in the back of a police car. He was not allowed to travel to the station with Greenway, the person Defendant had ridden with to Wienski's house despite the fact that Greenway too was driving to the station. He was then placed in a room for questioning with only police present and a police dog in close proximity. A reasonable person in that situation would not have felt comfortable leaving the station without clear permission from am officer, permission that Defendant never received.

This Court has recognized that "A person who is 'cut off from his normal life and companions,' and abruptly transported from the street into a 'police-dominated atmosphere,' may feel coerced into answering questions." *Cortez*, 299 Mich App at 695 (citations omitted). In *Yarborough*, the United States Supreme Court found that the state court reasonably determined that the defendant was not "in custody" for *Miranda* purposes, because the defendant was not transported to the station house by police. *Yarborough*, 541 US at 655.

-4-

Contrary to the facts set forth in *Yarborough*, here, defendant was transported to the police station by armed police officers, a fact on which the trial court placed a great deal of emphasis. The prosecution argues that this factor does not weigh in favor of finding that defendant was "in custody" because defendant agreed to speak with the police officers at a location different than Wienski's house. According to the prosecutor, defendant arrived at Wienski's house as the passenger in a vehicle driven by another individual, identified as Ron.[3] Defendant asserted that he met Ron the day before, and Ron drove defendant home in exchange for a generator. According to the prosecutor, Detective Bryan Gandy asked defendant if he would go to the police station to talk in a "better area" than on the lawn at Wienski's home, and defendant agreed. Deputy Kevin Mahan then "had defendant take a seat" in the back of his patrol vehicle to transport defendant to the satellite office. Mahan did not force defendant into the car, or place defendant under arrest. Defendant was not handcuffed during the ride. However, as noted by the trial court, defendant was not offered the opportunity to ride with Ron to the police station. According to the prosecutor, the detectives offered defendant a ride "out of convenience," and defendant accepted.

The prosecution further argues that, despite questioning occurring at the police station, the doors to the office where the questioning took place remained unlocked, which also weighs against a finding of custody. Gandy testified that the office doors locked from the outside, "like a school," so an individual could exit the office freely, but entrance into the office was restricted. During the interrogation video, a knock is heard on the door behind defendant, and one of the detectives stood up, opened the door, and was seemingly handed the drink that defendant was offered. Gandy did not lock the doors once defendant was inside the office. Other people entered and exited the room freely. Defendant is seen in the video watching people enter and exit through the door located behind him. There are sounds of doors being opened and closed in the background of the interrogation video. There were two doors in the office that exited the room, and another door to an attached office. Gandy testified that defendant sat next to a door that exited the office. A door is visible in the interrogation video behind defendant and to his right, but the actual door knob is not within the camera's frame for the entirety of the video. At one point, Gandy said that he needed to step out for a minute. In the interrogation video, a uniformed individual left through the door behind defendant, but only the back of his body from the shoulders down is visible. Presumably, this was Gandy. From the background sound of the video, it did not sound like Gandy had to use a key or badge to open the door behind defendant. Gandy returned into the interrogation room, and then Detective Hinkley stepped out.

Although there is evidence that the office doors were unlocked, this does not outweigh the fact that questioning occurred in an office at the police station, in the constant presence of armed police officers, to which defendant was escorted into by armed police officers following being transported in a marked police car. Thus, it is unlikely that a reasonable person would believe that they were free to terminate the interview and leave after being transported to the station in a marked vehicle, escorted into the building by armed police officers, questioned by

---

[3] Although not specifically stated, it appears that Ron is referred to in the trial court's opinion by his last name, Greenway.

armed police officers who used an increasing hostile tone. Additionally, the fact that the police knew that defendant did not have his own vehicle and insisted that he be driven in a police vehicle supports the trial court's finding that the police took defendant into custody off his front lawn.

We recognize that the facts presented in this case are certainly subject to interpretation. However, the prosecutor seems to place too great an emphasis on the subjective intent of the officers and defendant in asking us to find that the trial court clearly erred by finding that the evidence favored a finding that defendant was in custody relative to the issue of where the questioning took place. However, case law dictates that "[t]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury*, 511 US at 323. This Court has made similar legal pronouncements. In *People v Zahn*, 234 Mich App 438, 449; 594 NW2d 120 (1999), we wrote: "The determination of custody depends on the objective circumstances of the interrogation rather than the subjective views harbored by either the interrogating officers or the person being questioned." See also, *Coomer*, 245 Mich App at 219. Utilizing that standard, we cannot find that the trial court clearly erred when it found that the totality of the factors regarding the location of the questioning weighed in favor of a finding that defendant was in custody.[4]

## B. DURATION

Gandy testified that the interview lasted approximately 90 minutes, the same amount of time as the interrogation video. The trial court determined that this was a neutral factor in making a custody determination, a finding in which we concur. The *Yarborough* Court determined that a two-hour interview weighed in favor of a finding of custody. *Yarborough*, 541 US at 665. Conversely, in *Mathiason*, the United States Supreme Court determined that a half-hour long interview did not constitute a custodial interrogation. *Mathiason*, 429 US at 495. In *People v Mendez*, 225 Mich App 381, 383; 571 NW2d 528 (1997), the defendant was also interviewed for 90 minutes. This Court found that the defendant was not "in custody" for *Miranda* purposes, but likened the facts of the case to *Mathiason*, because the defendant voluntarily went to the police station, was informed that he was not under arrest, and was permitted to leave at the end of the interview. *Id*. Lastly, in *Fields*, the defendant was questioned between five and seven hours, a factor which the Supreme Court, while finding lent some support to defendant's argument that *Miranda*'s custody requirement was met, ultimately

---

[4] In reaching this conclusion we reject the trial court's assertion that: "The average person that is summoned to a police station to talk with a detective would not feel comfortable leaving the station until the discussion was terminated by that detective." Here, the trial court seems to infer that questioning a suspect in a police station, by itself, can provide a legal basis for a finding that a person is "in custody." Such a conclusion runs afoul of *Mathiason*, and we therefore reject that portion of the trial court's analysis. *Mathiason*, 429 US at 494-495.

found was not controlling on the issue as to whether defendant was subjected to custodial interrogation. *Fields*, 565 US at 515.

## C. STATEMENTS

In *Yarborough*, 541 US at 665, the Supreme Court held that failure to tell the suspect that he is free to leave can lead to a finding that a suspect was in custody. "Unlike the officer in *Mathiason*, [the officer] did not tell [defendant] he was free to leave . . . .These factors weigh in favor of the view that [defendant] was in custody." This factor has also been acknowledged by our Chief Justice, when he wrote for the majority in *Elliott*, 494 Mich at 309, however finding the lack of a similar statement not pertinent to a defendant who was already incarcerated. Unlike the facts presented to our Supreme Court in *Elliott*, here, defendant was taken from his front lawn to the back of a patrol car and ultimately to a police station. Hence we find the issue of whether defendant was told he was free to leave relevant in our determination as to whether defendant was subjected to custodial interrogation.

Gandy did not recall telling defendant that he was free to leave. He believed that he told defendant that they could finish at any time. However, it was not until the end of the interview and after defendant stated that he needed a lawyer that Hinkley told defendant that he was not under arrest, and could finish any time. This weighs in favor of a finding of custody. *Id*.

In addition to finding that the police did not initially tell defendant that he was not under arrest or that he could leave at any time, the trial court also found that the increasingly accusatory nature of the interview weighs in favor of a finding of custody. See *Tankleff v Senkowski*, 135 F3d 235, 244 (CA 2, 1998) (holding that the officers' increasingly hostile questioning transformed an interrogation into custodial interrogation before the defendant was advised of his *Miranda* rights). And, as we have pointed out before, " . . . the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury*, 511 US at 323. However, "an officer's views concerning the nature of an interrogation, or beliefs concerning the potential culpability of the individual being questioned, may be one among many factors that bear upon the assessment whether that individual was in custody," if the officer's views were "somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave." *Stansbury*, 511 US at 325.

Gandy described the interview as relaxed, and certainly in the beginning phases of the interview that appears to be an accurate description. Again, however, we note that while the subjective understandings of the police and suspect can be relevant, they are not controlling. Later in the interview, Gandy testified that there was a point in the interview where he started to feel like defendant was not telling the detectives everything that defendant knew. Hinkley asked defendant if he told them everything that he could think of, and defendant said that he did, and "[i]f there's anything else you can think of, please ask." Gandy remembered Hinkley saying, "no bull****," to defendant, but asserted that this was not confrontational. The change in tone of the detectives occurred at about 53 minutes into the interview. At that point, Hinkley told defendant that he thought that defendant loved Wienski, but he did not want defendant to "bull****," and

thought something else had happened. Although Hinkley did not raise his voice, he became increasingly more aggressive toward defendant:

> *Detective Hinkley*: ... Whatever petty bull****, and it's probably petty bull****, we don't care, but you got to be up front with me, man.

* * *

> *Detective Hinkley*: ... You know that I know a lot more than what I'm saying. Okay? I do. All right? I ain't gonna bull**** ya. ... I don't think you did anything to her. But, dude, there's some things that you're not telling me or there's some things you're not telling me accurate. All I ask of you is be straight up with me. If it's petty bull****, I don't give a f*** about it. It can go in the wind. It can go in the wind. I don't give a s***.

Hinkley asserted that the police knew that defendant was driving Wienski's car over the past few days, but defendant denied it. Hinkley said that he did not believe defendant, and the detectives had "been around the block 100 times." Hinkley also said that defendant had "been around the block" because he was "in the system," referring to defendant's criminal history.[5] The detectives continued to assert that defendant was being untruthful, even though he said he was "being straight up."

> *The Defendant*: I don't have anything on my chest. That's just it. That's why I'm saying how can I help you? It's like you're trying to tell me I'm doing something or did something or know something. I don't want to do nothin' but try to help to get her back.

The detectives continued to disbelieve defendant, and asked if defendant would pass a lie detector test. Defendant said that he would pass, but would not take one because the detectives were "pointing fingers" at him. After approximately 1 hour and 14 minutes of questioning, defendant said, "Well, I think I need a lawyer now." Hinkley replied that defendant was not under arrest.

> *The Defendant*: So, if that's the case, can we finish then?

> *Detective Hinkley*: We can finish any time. But, what I'm saying to you is, here's the thing, you can finish any time you want. But, what I'm saying to you is ...

> *The Defendant*: I don't want to not finish if it's going to hurt her, but I'm not gonna continue down this path.

---

[5] Defendant told the detectives that he had been to court that day on a charge of possession of stolen property.

At this point, Detective Hinkley accused defendant of lying several times, and told defendant to "man up." After an hour and 17 minutes, defendant said,

> I don't like where this is going, with – it looks like I'm going to have to get a lawyer, because you guys are trying to put something on me and I'm not gonna say anything that would incriminate me for anything.

We concur with the finding of the trial court that the accusatory nature of the questioning of defendant weighs in favor of a finding of custody. *Tankleff*, 135 F3d at 244. The detectives interrogated defendant, as they asked questions and made statements that they knew were reasonably likely to elicit an incriminating response. See, *People v White*, 493 Mich 187, 195; 828 NW2d 329 (2013). Defendant's statements make it clear that he did not think that he was at liberty to leave. He initially asked how he could help. After defendant believed that the detectives were accusing him, he asked if they could finish. Seemingly, defendant asked the detectives if they were finished so he would get their permission to leave.

Clearly, Gandy believed defendant was a suspect prior to meeting with defendant. Although not used as a basis for the trial court's findings, when the police first came upon defendant, they were searching Wienski's home, where defendant stated he resided, pursuant to a search warrant. Although the record is somewhat vague as to the time outline, it does appear that prior to defendant arriving at the home, Gandy had procured a search warrant of Wienski's home, in part, based on naming defendant as a suspect who burned her car. Hence, before Gandy met defendant, he had already identified him as a suspect, a fact which may, explain the nature and tenor of the questioning. While we acknowledge that Gandy's beliefs are relevant "only to the extent that they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her 'freedom of action,' " *Stansbury*, 511 US at 325, we find that the accusatory tone of the questioning would lead a reasonable person to perceive that they were not free to leave until the police approved their departure from the interview. Again, while recognizing that the subjective opinions of the officers do not bear on our finding of whether defendant was "in custody," if the officer's views were "somehow manifested to the individual under interrogation [those views] would have affected how a reasonable person in that position would perceive his or her freedom to leave." *Stansbury*, *511* US at 325.

After reviewing the facts surrounding the statements by the police and defendant in their totality, we are not left with a definite and firm conviction that a mistake was made by the trial court's finding that a reasonable person would not believe they were at liberty to terminate the interview without incident, therefore, reasonably and objectively believing themselves to be in police custody. *Coomer*, 245 Mich App at 219.

## D. PHYSICAL RESTRAINTS

Here, there is no dispute that defendant was not initially handcuffed during the interview, and no dispute that he was handcuffed at minute 88 of the 90-minute interview for transport from the Calhoun County Sheriff's Department satellite office to the Mount Morris Police Department. Prior to being handcuffed, defendant was never formally placed under arrest by the Calhoun County detectives. Generally, the lack of handcuffs weighs against a finding of

custody. *Mathiason*, 429 US at 495; *Yarborough*, 541 US at 664, and the trial court so found. However, after making this finding, the trial court found there were other restraints present in this case. The trial court noted that defendant having to ride to the police station in the back of a patrol car, and being escorted into the police station by armed police officers were forms of restraint. Additionally, the trial court noted that defendant appeared to be in the presence of at least one armed police officer at all times. Finally, the trial court noted, after the tone of the interview became more heated officers made known to defendant that a police dog, which was present in the room, could "blow [defendant] right off [his] feet." We examine each of these findings in order.

It is undisputed that defendant was driven to the satellite office in a police vehicle. As found by the trial court, this mode of transportation implies a physical restraint regardless of whether the prosecutor's assertion that defendant voluntarily accepted the ride is accurate. No one unambiguously testified that defendant was "escorted" into the station. However, Mahan testified that he let defendant out of the backseat of his car at the station, and defendant "went inside the office with [the] detectives." Gandy testified that he and Hinkley brought defendant inside. There is no indication in the record that the detectives threatened or brandished any weapons to defendant during the interview; however, Gandy testified that he and Hinkley were armed during the interview. In viewing the totality of the circumstances, riding to a police station in a marked vehicle, being walked in by armed detectives, and then being interviewed by armed police officers constituted physical restraints on defendant's freedom of movement, and a reasonable person would not feel at liberty to terminate the conversation and leave under such circumstances.

The prosecution asserts that the presence of the canine officer and police dog did not present any restraints on defendant's movement. Seemingly, Hinkley asked Sergeant Brad Hall[6] to enter the office so that he could step out to speak to Gandy. Hinkley asked defendant if he cared about the police dog entering the room, and defendant responded, "No. I like dogs." Hall entered the room with the police dog. Defendant engaged in casual conversation with Hall regarding the police dog:

> *Sergeant Hall*: He's a good boy. He's pretty friendly.
>
> *The Defendant*: I bet he has his moments where he isn't.
>
> *Sergeant Hall*: Oh, he'll blow you right off your feet if I send him.
>
> *The Defendant*: Right. I bet.
>
> *Sergeant Hall*: Yeah. But, no, he's a good boy.

---

[6] Although referred to as "Sergeant Brad" in the interview transcript, Deputy Mahan identified the canine officer as Brad Hall at the evidentiary hearing.

They continued to talk about the dog's toy, and how Sergeant Hall used the dog for tracking. However, Sergeant Hall then told defendant how important it was for defendant to tell the truth:

> *Sergeant Hall*: So, that's why it's really important. Sometimes people go all hardcore and whatever, and they – they wait until the very last second and it kind of makes 'em look really bad. So, it's best to – best to – to, I don't know, I guess you just want to make sure that – you seem like a really nice guy. You want to make sure that you're as truthful as possible because – because you know, it's going to be rough otherwise. You see what I mean?

> *The Defendant*: Um-hum.

> *Sergeant Hall*: So, I don't know, that's just the only advice that I can give ya. It's always, always – it's always, always, no matter what situation you're in, it's always best to tell the truth. It's hard to stick with a lie.

After Gandy returned to the office and said that the Mount Morris Police Department wished to speak to defendant, Sergeant Hall asked defendant if there was anything else that he wanted to say after their conversation. Sergeant Hall said, "I know you got something else there. I can see it written all over your face. . . . Just got to say – say the truth. Say what happened."

Here, some context to the conversation is important to note. The statement regarding the dog being able to "blow defendant off his feet," was made in response to a question by defendant that the dog could really do some harm. After defendant made that statement, Hall told defendant that the dog would only do what he, Hall, told the dog to do. We cannot find anything from the tape or the transcripts which would lead us to conclude that the dog was placed in the room as a means of physical control over defendant. Additionally, under these limited facts, we cannot conclude that a reasonable person would believe that the dog was present in the room as a means of physical control. Accordingly, we reject the trial court's finding that the presence of the police dog imposed a physical restraint on defendant's freedom to move. Even if we were to conclude, as suggested by defendant's counsel, that the police brought the dog into the room because he was "soft on dogs," we cannot conclude that the dog in any manner imposed a restraint on defendant's freedom. However, we do find that the trial court did not clearly err in finding that other physical restraints were placed on defendant, the degree to which favors a finding that defendant was in custody.

## E. RELEASE

In *Mathiason*, the Supreme Court used the fact that Mathiason was allowed to leave the police station at the end of the interview as one of the circumstances that led them to conclude that Mathiason had not been in custody. *Mathiason*, 429 US at 495. Here, at the end of defendant's interview, Gandy said that the Mount Morris Police Department wanted to talk to defendant, so at that time, Mahan handcuffed defendant, and returned defendant to Mahan's patrol car for transport. After that the following colloquy took place:

> *The Defendant*: Am I under arrest?

*Detective Gandy*: We're transporting you to another department and that's going to be up to them. But, we can't transport you without being restrained, for safety reasons.

*The Defendant*: He said yeah, so I am being arrested?

*Unidentified Speaker* [Deputy Mahan]: I didn't say yeah.

*The Defendant*: I thought you said yeah.

*Unidentified Speaker* [Deputy Mahan]: I didn't say nothin'[7].

The prosecution argues that this factor weighs against a finding of custody because defendant was not arrested by the sheriff's department that conducted the interview. However, the prosecutor also asserts that at the time of the handcuffs being placed on defendant, he was in custody for purposes of *Miranda*.[8] Defendant was not released upon termination of the questioning, but rather, was placed in handcuffs and transported to another police department. Because defendant was not released at the end of questioning, this factor weighs in favor of a finding of custody. *Yarborough*, 541 US at 664-665; *Mathiason*, 429 US at 495.

Given the totality of the circumstances surrounding the above-referenced factors, and this Court's review for clear error of the trial court's factual findings concerning the circumstances surrounding statements to the police, we are not left with a definite and firm conviction that a mistake has been made relative to the trial court's factual findings. *Coomer*, 245 Mich App at 219. Further, relative to the issue of whether defendant was in custody at the time of his interrogation, based on our review of the totality of the circumstances we concur with the trial court that a reasonable person in defendant's position would not have felt free to terminate the interview and leave. *Fields*, 565 US at 509; *Cortez*, 299 Mich App at 691. Accordingly, defendant was in "custody" at the time of his interrogation.

## II. COERCIVE ENVIRONMENT

As our Supreme Court and the United States Supreme Court have stated, determining whether an individual's freedom of movement was curtailed is the first step in the analysis, not the last. *Elliott*, 494 Mich 292, 308; *Fields*, 565 US at 509. This point is best illustrated by the Supreme Court's ruling in *Berkemer v McCarty*, *supra*. In *Berkemer*, the Supreme Court held that the roadside questioning of a motorist who was pulled over in a routine traffic stop did not constitute custodial interrogation. 468 US at 423, 441-442. The Supreme Court held that "a

---

[7] Our review of the audio recording leads us to believe that someone said "yeah" in response to defendant's question of whether he was under arrest.

[8] Presuming an issue exists relative to whether defendant invoked his right to counsel, that issue was outside the scope of remand and was not considered by the trial court. Consequently, there is no record that would permit our review of the issue. Accordingly, we express no opinion as to whether, or when, defendant exercised his right for the presence of counsel.

traffic stop significantly curtails the 'freedom of action' of the driver and the passengers," and that it is generally "a crime either to ignore a policeman's signal to stop one's car or, once having stopped, to drive away without permission." 486 U.S., at 436; *Fields*, 565 US at 510. "[F]ew motorists, would feel free either to disobey a directive to pull over or to leave the scene of a traffic stop without being told they might do so." *Id.* Nevertheless, the Supreme Court held that a person detained as a result of a traffic stop is not in *Miranda* custody because such detention does not "sufficiently impair [the detained person's] free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." 468 US at 437. Hence, the temporary and what the Supreme Court characterized as "relatively nonthreatening" detention that follows a *Terry*[9] stop was insufficient for a finding of custody under *Miranda*. *Id.* What follows then is the idea that not all restraints on an individual's freedom of movement are tantamount to custody for purposes of deciding whether a person has been subjected to custodial interrogation under *Miranda*. The often-quoted statement from *Berkemer* makes the point: [the Supreme Court] ha[s] "decline[d] to accord talismanic power" to the freedom-of-movement inquiry. *Berkemer*, 468 US at 437. In all such cases, a reviewing Court must ask the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*. *Fields*, 565 US at 509.

On remand, our Supreme Court instructed the trial court to consider its decision in *People v Elliott*, 494 Mich 292; *People v Barritt*, 501 Mich 872. In *Elliott*, our Chief Justice, writing for the majority, concluded that the defendant was not "in custody" for *Miranda* purposes. *Elliott*, 494 Mich at 295. Elliott was incarcerated for a parole violation, and was taken to the jail library by a deputy to be questioned by a parole officer for 15 to 25 minutes. *Id.* at 299, 308. Elliott was not physically restrained. *Id.* at 308. Elliott was never told that he was free to leave the meeting and return to his jail cell. *Id.* at 309. Based on these facts, as well as other considerations, our Chief Justice concluded that the inherently coercive pressures present in *Miranda* were not present in *Elliott*. *Id.* at 311. Elliott was not questioned for an extended time by armed police officers using a sharp tone and profanity; rather, the parole officer visited Elliott as part of her job. *Id.* at 311-312. Elliott did not indicate that he did not want to speak to the parole officer. *Id.* at 312. Thus, Chief Justice MARKMAN concluded that these circumstances were "hardly the sort of incommunicado, police-dominated atmosphere involving custodial interrogation and the 'overbearing' of the subject's will toward which *Miranda* was directed." *Id.* at 313.

We acknowledge that Gandy testified that, in his opinion, the police did not coerce defendant to talk. In fact, throughout the beginning of the interrogation video, defendant maintains a relaxed tone and posture, often laughing throughout the conversation. He lightheartedly told a story about Wienski's mom thinking that he stole one of her spoons on Thanksgiving. Defendant was asked what he wanted to drink, and he jokingly responded, "Beer. Coke." However, the subjective opinions of the officer aside, the facts as a whole demonstrate that the environment presented, what the trial court correctly labeled as "the same inherently coercive pressures as those present during the station house questioning in *Miranda*." Unlike

---

[9] *Terry v Ohio*, 392 US 1; 88 S Ct 1868; 20 L Ed2d 889 (1968).

-13-

Elliott who was incarcerated, from the time the officers saw defendant at Wienski's home, he was always in the company of at least one armed officer. Defendant was on his front lawn when he was told by police to get into the back of a police car. His dog had been forcibly removed from the home by animal control officers. He had no idea where the dog had been taken or how he would be able to secure the dog's return. He was not able to drive to the police station in the same car that brought him to the house, despite the fact that the police had told defendant's driver to drive to the very same police station. When the police car stopped, testimony indicated that armed detectives led defendant from the police car into the police station. Also from the testimony of the officers and review of the video, we conclude that there was never a time when defendant was not being watched by an armed police officer. Defendant did not get to arrange the time of the interview, the place of the interview or when the interview would conclude. Rather, defendant was told when he was being interviewed, where he was being interviewed, and the tenor of the interview. At the end of the interview defendant was handcuffed and placed in another police vehicle. In sum, defendant was never "free" to any significant degree. Rather, his freedom of movement, along with his choices, had been taken from him by police officers from the time he was told to get into the back of the patrol vehicle.

Hence, this is not a case where the defendant was already in police custody, or incarcerated or where the defendant was allowed by police to schedule a time or place for the interview or even select the mode of transportation to the interview. As alluded to in *Elliott*, it is difficult to imagine a setting other than prison where an individual's freedom of movement is *more* controlled by outside factors. Defendant was not initially told he could leave or terminate the interview. Within a short time of being told he could end the interview at any time, defendant was handcuffed and placed inside another police vehicle for transportation to a different police station. The interview became increasingly accusatory as the detectives asserted that defendant was lying, and did not tell them everything that he knew. The detectives asked defendant if he would pass a lie detector test, a statement indicative of psychological intimidation. An additional canine officer entered the room, and again appealed to defendant's sense of honesty, and encouraged him to tell the truth. Taken together, these facts indicate a coercive environment. "Fidelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated." *Berkemer*, 468 US at 437. Ultimately, it becomes apparent that this case *is* the type of situation that compels *Miranda* warnings be given.

Accordingly, we conclude that the trial court did not clearly err in finding that a reasonable person in defendant's position would have felt that he was not at liberty to terminate the interrogation and leave, and the environment presented the same coercive pressures as the type of station house questioning in *Miranda*. Therefore, defendant was "in custody," and his Fifth Amendment rights were violated when he was not advised of his *Miranda* rights.

Affirmed.

/s/ Stephen L. Borrello
/s/ Michael J. Kelly

-14-