*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
September 10, 2020

Plaintiff-Appellee,

v

No. 348886
Kent Circuit Court
LC No. 18-005252-FC

QUINN ANTHONY JAMES,

Defendant-Appellant.

Before: REDFORD, P.J., and BECKERING and M. J. KELLY, JJ.

PER CURIAM.

Defendant, Quinn James, appeals by right his jury trial convictions first-degree murder, MCL 750.316,[1] and conspiracy to commit first-degree murder, MCL 750.157a. He was sentenced as a third-offense habitual offender, MCL 769.11, to life imprisonment without the possibility of parole for both offenses. Because there are no errors warranting reversal, we affirm.

## I. BASIC FACTS

On January 24, 2018, at approximately 6:04 or 6:05 a.m., Mujey Dumbuya, a 16 year-old high school student, said goodbye to her mother and left home. Normally, Dumbuya would walk

---

[1] James's first-degree murder conviction is supported by two theories: premeditated murder under MCL 750.316(1)(a) and felony-murder under MCL 750.316(1)(b). Although dual convictions of premeditated murder and felony murder arising from the death of a single victim violate double jeopardy, *People v Coomer*, 245 Mich App 206, 224; 627 NW2d 612 (2001), in this case because James received "one conviction of first-degree murder, supported by two theories," he only has "one conviction and one sentence for having committed one crime," see *People v Williams*, 475 Mich 101, 103; 715 NW2d 24 (2006).

to a nearby bus stop to go to school, but that day she did not get on the bus or go to school. One day later, her family called the Grand Rapids Police Department to report her missing.[2]

Three days later, on January 28, 2018, a girl's body was discovered by two students who were walking in a wooded area in Kalamazoo, Michigan. One student "noticed garbage all around," which made him look into the woods. At first, he thought he saw a pile of clothes 20 to 25 feet from the path, but the unnatural positioning and the presence of braids suggested it was a body. The students called 911.

From the walking path, the responding police officers could not tell it was a body, but when they got closer it was apparent that it was a girl and she was deceased. The girl was wearing only one pink shoe, and there was a blue plastic cap on her arm. Her blue jeans were pulled to her knees, her underwear were not secured to her hips, and her coat looked as if it had been pulled over her head. Some of the officers described smelling a chlorine-based product, and the girl's clothing—which was streaky and appeared discolored by a bleach-like substance—was damp.

On January 29, 2018, an autopsy was performed. The forensic pathologist testified that the girl's body was partially frozen, but there was no way to determine how long her body had been in the woods. The forensic pathologist opined that the cause of death was asphyxia including strangulation. The girl did not have any identification and the police were unable to identify her by her fingerprints. Because there was a Grand Rapids Rapid Bus pass on the body, the Kalamazoo police called the Grand Rapids police. Based on the description of the body, the Grand Rapids police suspected that the girl might be Dumbuya. Using Dumbuya's dental records they police were able to positively identify the body as Dumbuya.

By January 30, 2018, the police were investigating the possibility that James was involved in Dumbuya's murder. At the time, James was awaiting trial on four counts of third-degree criminal sexual conduct (CSC), MCL 750.520d(1)(a). The basis for the charges was Dumbuya's November 2017 disclosure that between July 2017 and September 2017, when she was 15 years old, James had sexually assaulted her on a number of occasions. In November 2017, James had admitted to the police that he had sex with Dumbuya on two occasions while Daquarious Bibbs, his fictive nephew, was present.[3] And, during a recorded jail call, he told his mother that he had sex with Dumbuya. Although James maintained that the encounters were consensual, Bibbs testified that Dumbuya had not consented to having sex with James.

---

[2] The police report classified Dumbuya as a runaway case, not a missing person. It is not clear that Dumbuya's family reported that she had run away, however. Nevertheless, there was evidence that on January 24, 2018, around 1:00 a.m., Dumbuya told a friend that she wanted to meet him at the mall after school and she was going to run away or "go MIA" for a while. Additionally, she told her ex-boyfriend, Daquarius Bibbs, that she was planning to run away.

[3] Bibbs's aunt, Tiara Burnett, was James girlfriend or fiancé.

James was arrested on the CSC charges and incarcerated at the Kent County Jail. On November 17 and November 19, 2017, James told Lenard Conyers, an inmate at the jail, that he was facing a 25-year minimum for a CSC case. Conyers testified that James told him that he was not going to let the girl testifying against him get on the stand. He asked Conyers if he knew anyone in Detroit, but Conyers told him that he did not. James then stated that he would get in touch with some guys he knew in Detroit to see if they "knew somebody that would not let her get on the stand."

On November 18, 2017, James mentioned in a recorded jail call to his girlfriend or fiancé, Tiara Burnett, that Dumbuya had not yet testified on the record. James was released on bond. His preliminary examination for the CSC charges was scheduled for November 30, 2017. One day earlier, a Grand Rapids city bus driver noticed something unusual on her morning route. The driver described a "vehicle that was acting differently," keeping up with her, going away from her, going in front of her, and then waiting for her to pass. The driver's route typically started at 5:30 a.m. and she would arrive at the stop near Dumbuya's apartment building close to 6:00 a.m., Dumbuya would "quite often" get on the bus, and she would get off at the stop near her school. The unusual vehicle incident started immediately after Dumbuya boarded the bus on November 29, 2017. At 8:04 a.m., the bus driver posted on Facebook what she had seen, noting that the vehicle in question was a silver GMC Acadia with the license plate DGU6067. During their investigation, the police learned at that time James had possession of a loaner car from the Todd Wenzel dealership that had the same make, model, and license plate number as the vehicle following Dumbuya's bus.

James had a number of conversations regarding Dumbuya and the CSC allegations. For instance, on December 7, 2017, he told one person that the "motherfucker little bitch done accused me of rape," but he had never raped anyone in his life. Then, during a December 8, 2017 call, James told that person he was charged with four counts of rape and was worried about his job and his children. He hoped that Dumbuya would go on vacation and her plane would crash.

James also had contact with a Kalamazoo woman who considered him a friend. The woman testified that although she had not had contact with James for a while, he called her in November and December 2017. He sounded "pretty mad" when he called, and he told her that something was going on and someone was trying to pin something on him. He mentioned that it was a CSC, but did not tell her the exact charges. He asked her where he could get a gun for protection from a "cousin" who was accusing him of some things.

James later obtained a gun from Daren Eckford. Eckford testified that in near Christmas of December 2017, James visited him in Detroit so that he could purchase a gun. Eckford sold James a .30 caliber rifle. Eckford explained that James told him that he "needed to take care of some business" because a young man had set him up on rape allegations and "had the girl lying on him." Eckford described James as emotional, saying that he did not want to get locked up and repeating that the girl was lying. Later, over the phone, James told him that the gun was too loud. James asked Eckford to come to Grand Rapids to help him take care of the problem with the rape, but Eckford declined.

Eckford testified that James asked him to help find someone to "take care of that," so he referred him to Gerald "Roach" Bennett. He recounted telling Bennett that "my man needs something took care of" and that Bennett was "cool" with that. In a text message sent to James on January 3, 2018, Eckford wrote "got somebody." James responded, "Oh, hold on." Eckford texted back, "My bad, call Roach." James then asked, "Is this nigga the feds?" Eckford answered, "No."

Eckford testified that in January 2018, James came to Detroit to pick Bennett up,[4] and cellular phone analysis of James's and Bennett's phones show that by 10:15 p.m. on January 21, 2018, both phones were in the Grand Rapids area. Bennett's girlfriend testified that she was surprised to receive a $125 wire transfer on January 23, 2018. Cellular phone analysis, James's bank records and surveillance video from a Meijer department store show that James wired her the money from the store and Bennett was with him when he did so. The two men left the store in a black car.

The cellular phone analysis also placed both men in the vicinity of Dumbuya's apartment and/or bus stop. Specifically, James's phone was near her apartment near midnight on January 23, 2018, and Bennett's phone was in the same general area less than an hour after midnight on January 24, 2018. Further, Bennett's phone was near Dumbuya's bus stop on January 24, 2018, approximately one hour after Dumbuya would have normally caught her bus. Bennett then returned to the area around James's residence. Neither James's nor Bennett's phones showed any location information between 7:40 a.m. and 9:09 a.m. on January 24, 2018.

The prosecution presented other evidence, however, showing that the two men drove to Kalamazoo in a black 2018 GMC Acadia, dumped Dumbuya's body by 8:42 a.m., and then drove to a Grand Rapids car wash. Two trail cams near where the body was discarded show a black GMC Acadia driving back and forth near the dump site. It finally left the area at 8:42 a.m. Although the license plate number was not visible, testimony and documentary evidence confirms that from January 19, 2018 until January 24, 2018, James had possession of a black 2018 GMC Acadia that he had received as a loaner vehicle from the Todd Wenzel dealership. Dumbuya's DNA was located in the third-row back seat of that vehicle.[5]

---

[4] Although James apparently would have normally had custody of his twins during the week of January 21, 2018, on January 18, 2018, he texted the children's mother and asked if he could "bring the twins to you Sunday at like 12:00 and pick them up at 12:00 the following Sunday. Got to drive up north to pick up my brother." She agreed.

[5] The forensic scientist who analyzed the sample explained that there was a 1 in 36 nonillion chance that an unrelated, random individual would have the same major donor profile as Dumbuya.

In addition, cellular phone analysis shows that at approximately 9:09 a.m. Bennett's phone pinged off a tower along US-131 and continued along that road toward southern Grand Rapids.[6] At 9:24 a.m. James's credit card was used at a gas station off of US-131. It was later used at a Mister Car Wash on 28th Street in Grand Rapids, and cellular phone analysis placed James's phone in the vicinity of that car wash.[7] Surveillance video from the car wash confirms that the black vehicle was the same vehicle that was loaned to James by the dealership. Later that afternoon, around 1:00 p.m., James and Bennett's cellular phones were in the vicinity of the dealership, and a dealership employee testified that a middle-aged man was with James when he returned the vehicle that day.[8]

James was also linked to Dumbuya's murder by additional forensic evidence. Specifically, a swab of Dumbuya's blue jeans contained a mixture of multiple DNA contributors. A forensic scientist testified that, based on her analysis of the DNA mixture on Dumbuya's blue jeans, it was "at least 79 million times more likely to be explained as a mixture from [Dumbuya], James, and two unrelated, unknown individuals than" it was to be a mixture from Dumbuya and three unknown individuals. She explained that "this analysis provides very strong support that Quinn James is a contributor to the DNA typing results obtained from the swab of the blue jeans" and she concluded that James was a contributor to the DNA profiles contained on the blue jeans.

Home surveillance footage from James's house shows that on January 24, 2018, at 4:18 p.m., he arrived home with Bennett. Bennett walked out of the house at 4:49 p.m., and a blue Chevy Caprice is seen leaving. Cellular phone analysis showed that by 8:00 p.m., Bennett's phone was back in Detroit.[9] Bennett's girlfriend testified that she received a vehicle from Bennett when he returned from Grand Rapids. The Bill of Sale listed James as a witness to the purchase. The vehicle belonged to Burnett's brother, who testified that he sold it to James for $2,000, but he

---

[6] On January 26, 2018, around 10:30 a.m., a woman driving from Kalamazoo to Grand Rapids observed a backpack on the side of US-131. Two days later, when she was making the trip again, she pulled over and picked it up. Inside the bag was Dumbuya's school identification, text books, a journal, and school binders.

[7] A police officer timed the drive from where Dumbuya's body was discovered to the Mister Car Wash; he testified that driving 75 miles per hour, he reached the car was in 44 minutes and 37 seconds.

[8] The employee's testimony that he believed the vehicle was returned on January 24, 2018, is supported by home surveillance footage showing that the vehicle that was being repaired by the dealership was in James's driveway approximately one hour after James and Bennett's phones were in the vicinity of the dealership.

[9] Bennett told his girlfriend that the person he was with in Grand Rapids was his "nephew." When Bennett was questioned by the police in March 2018, his phone had a deleted contact labelled as his "nephew." The number for Bennett's nephew was the same as James's phone number.

never received any money for it so he did not give James the title.[10] He said that when he signed the document on January 24, 2018, James was with a "stranger."

Before Dumbuya's body was discovered on January 28, 2018, James made a number of statements suggesting that the CSC case had been resolved. First, at some point after Bennett returned to Detroit, James told Eckford "it's done." In addition, on January 25, 2018, he told the woman from Kalamazoo that he was fine and that the "situation had been worked out." James told her that he was not going to be in trouble, that it was all a misunderstanding, and that he was "not charged with anything." On January 27, 2018, he told a fourth-grade teacher that the charges were basically dropped and that he was going to get his job back.

On January 28, at 10:00 a.m., the mother of James's twins asked him whether the CSC case had been dropped yet. In response, James said, "[Dumbuya] told them that I didn't do anything to her and that she was pressured by [Bibbs] to say that. It hasn't been dropped yet, but will be on the next court date." She texted back, "That's good she told the truth," and she added, "Now will they do anything to her for false statements or whatever it's called." James responded "I was so happy when my lawyer called and showed me her statement," and he also said, "Yes, she's getting three . . . charges." The twins's mother opined that "[Bibbs] should get charged too." James answered: "[Dumbuya] said [she] had a dream about his kids. He's a good father and was always nice to everyone. He didn't deserve this. His kids don't deserve it. Her mom called me and apologized." He also stated, "[Bibbs is] going to get away with nothing" and that "I learned a valuable lesson for real. Couldn't imagine my kids growing up without me. I'll never be in that situation again." In contrast, the officer in charge of the CSC case testified that Dumbuya never approached her about dropping the charges and Dumbuya's family never indicated anything like that either.

In February 2018, James was arrested and charged with an unrelated CSC from 2014. The woman in that case testified as a 404(b) witness. She recounted that James choked her and forced her to have sex with him in his bedroom. Afterward, he threatened to kill her, wrap her body in a blanket, and pour bleach on her body to destroy forensic evidence. She reported the rape and the threat to the police in 2014.

On February 3, 2018, James told Burnett over the phone that he wanted her to grab a pen and paper and write down his "comings and goings" for January 24, 2018 while they were still fresh in his mind. During the recorded jail call, he told Burnett that he went to Mister Car Wash in the morning, after a pause, he said, "oh, no, no, no, I didn't go to Mister Car Wash. Later in the call he said he went to the car wash "later" in the day. He also claimed that he dropped his half-sister's children off at school, but his half-sister's testimony and her children's school records reflect that he did not.

_____

[10] Eckford sent a letter to James in February 2018, stating "By the way, the brother said something about a title. Let me know." In response, he received a letter indicating it was from "George Robinson," but he explained that the letter was actually from James. In a jail call to Burnett, James instructed her to put $50.00 in George Robinson's prison account.

On July 2, 2018, James also placed two calls to Burnett using another inmate's ID number. A restaurant owner that James had previously offered to sell a gun to testified about that call. He explained that Burnett came to his restaurant close to 8:00 p.m., and after placing an order, she asked for the first time ever about his wife and daughter. The owner stated that Burnett then received a call, told him that it was James, and said "[he]wants to talk to you." The owner refused, but she kept trying to pass the phone to him. He told her that "[t]hey hear everything, they know everything, you know. What are you—what are you trying to do? You [sic] get more in trouble than where you're at." Burnett responded, "Well, they don't know because it's a different ID, different person," so he did not need to worry about it. The owner kept refusing, however, and Burnett eventually said, "okay never mind." The owner said to her, James "got pissed off, didn't he?" and she responded, "Well, he said he'll take care of it when he gets out."

## II. SUFFICIENCY OF THE EVIDENCE

### A. STANDARD OF REVIEW

In his pro se brief filed pursuant to Administrative Order No. 2004-6, Standard 4, James argues that there is insufficient evidence to sustain his convictions. Challenges to the sufficiency of the evidence are reviewed de novo. *People v Ericksen*, 288 Mich App 192, 195; 793 NW2d 120 (2010). Due process requires, that when the evidence is viewed in the light most favorable to the prosecution, a reasonable trier of fact could find each element of the crime established beyond a reasonable doubt. *People v Lundy*, 467 Mich 254, 257; 650 NW2d 332 (2002).

### B. ANALYSIS

James was convicted of first-degree murder under two theories: premeditated murder and felony murder. The elements of first-degree premeditated murder are "(1) the intentional killing of a human (2) with premeditation and deliberation." *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010). "The elements of first-degree felony murder are: (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result [i.e., malice], (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in" MCL 750.316(1)(b). *People v Smith*, 478 Mich 292, 318-319; 733 NW2d 351 (2007) (citation omitted). Unlawful imprisonment is a felony specifically enumerated in MCL 750.316(1)(b). In relevant part, MCL 750.349b(1) provides that a person is guilty of unlawful imprisonment "if he or she knowingly restrains another person . . . to facilitate the commission of another felony . . . ." "Restrain" means "to forcibly restrict a person's movement or to forcibly confirm the person so as to interfere with that person's liberty without that person's consent or without lawful authority." MCL 750.349b(3)(a). In addition, "[i]dentity is an essential element of every crime." *People v Fairey*, 325 Mich App 645, 649; 928 NW2d 705 (2018).

The prosecution contended that James either directly killed Dumbuya or he aided and abetting Bennett in the murder. A person who aids or abets the commission of a crime may be convicted and punished as if he or she directly committed the offense. MCL 767.39. "To support a finding that a defendant aided and abetted a crime, the prosecution must show that (1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts

or gave encouragement that assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time he gave aid and encouragement." *People v Izarraras-Placante*, 246 Mich App 490, 496-497; 633 NW2d 18 (2001) (quotation marks and citations omitted).

Viewing the evidence in the light most favorable to the jury's verdict, there was sufficient evidence to convict James of first-degree murder under either theory advanced by the prosecution. While in jail on the CSC charges relating to Dumbuya, James told another inmate that he was going to contact someone in Detroit to help him make sure Dumbuya did not testify against him. When he was released on bond, he followed Dumbuya's bus from her apartment to her school. He then contacted Eckford and bought a gun before deciding it was too loud. He asked Eckford to come to Grand Rapids to take care of the problem and when Eckford declined, he asked for a referral to someone who could help him. Eckford referred James to Bennett. Because Bennett's girlfriend received $125 from James and James gave Bennett a vehicle after the murder, the jury could reasonably infer that Bennett was paid to help James.

The week of the murder, James texted the mother of his twins, asking her to care for them that week in his stead. He travelled to Detroit to pick up Bennett and take him to Grand Rapids. The night before Dumbuya's disappearance James's and Bennett's phones were in the vicinity of her apartment complex. The next morning, Bennett's phone was in the vicinity of Dumbuya's bus stop. Although Dumbuya normally would board the bus at approximately 6:00 a.m., she did not board the bus on January 24, 2018. At trial, the defense theory was that she did not get on the bus because—consistent with statements she made to at least two people—she ran away. However, the night before her disappearance, she said she planned on running away after school. In addition, when located, her backpack contained school items, including text books and school binders, which allows for an inference that she did, in fact, plan on going to school the day she disappeared.

Dumbuya's body was dumped in Kalamazoo. The cause of death was asphyxia including strangulation. Her clothes were streaked with bleach and she had no identification on her body. There was evidence that, in 2014, in response to a possible rape charge, James threatened to kill his accuser and use bleach to conceal forensic evidence that might be located on her body. That allows for an inference that James attempted to conceal forensic evidence by pouring bleach on Dumbuya's body or aiding and abetting Bennett. Either way, James's DNA was located on Dumbuya's blue jeans, and Dumbuya's DNA was located in the back seat of a black 2018 GMC Acadia that James had borrowed from the Todd Wenzel dealership. The DNA link is strong evidence identifying James as one of the people involved in Dumbuya's abduction and murder.

The black GMC Acadia was photographed by trail cams while it was driving back and forth near where Dumbuya's body was dumped. Although the license plate number was not visible, the jury could reasonably infer it was the vehicle in James's possession because Dumbuya's DNA was found inside that vehicle. Dumbuya's backpack was also found on US-131 between Grand Rapids and Kalamazoo, suggesting that someone threw it out the window of a vehicle traveling that route. James and Bennett's cellular phone location data indicates that they were traveling along US-131 toward Grand Rapids after the body was dumped in Kalamazoo. Approximately 50 minutes after Dumbuya's body was dumped in Kalamazoo, James was captured on the surveillance video at a Mister Car Wash in Grand Rapids. The police testimony established

that the trip would take approximately 44 minutes to travel from the dump sit to the car wash if James was driving 5 miles over the posted speed limit.

James and Bennett returned the vehicle used to dump Dumbuya's body to the dealership. Bennett returned to Detroit. And James, before Dumbuya's body was located, began telling numerous people that the CSC case against him had been resolved and the charges were going to be dropped. When Dumbuya's body was discovered and after he knew he was a suspect in her death, James asked Burnett to write down his whereabouts on January 24, 2018 while they were "fresh" in his head. The police were able to confirm that while telling Burnett where he had been on January 24, 2018, James made multiple false statements, including a claim that he was not at the car wash in the morning and a claim that he dropped off his half-sister's children at school.

Viewing the foregoing evidence in the light most favorable to the jury's verdict, there was overwhelming evidence that James either directly killed Dumbuya after planning her murder or that he aided and abetted Bennett's killing of Dumbuya. Moreover, although he argues on appeal that the evidence in insufficient because no one saw anyone actually "kidnap" Dumbuya, the circumstantial evidence shows that between 6:00 a.m. and 8:42 a.m., Dumbuya was confined by James or he aided and abetted Bennett in confining her. Her DNA was in James's rental vehicle (which he rented for the first time in January 2018) and his DNA was on her blue jeans despite the fact that she had no contact with him since November 2017.

James also argues that there is insufficient evidence to sustain his conviction of conspiracy to commit first-degree murder. As explained in *People v Jackson*, 292 Mich App 583, 588; 808 NW2d 541 (2011), "[a] criminal conspiracy is a partnership in criminal purposes, under which two or more individuals voluntarily agree to effectuate the commission of a criminal offense." The *Jackson* Court explained:

> The individuals must specifically intend to combine to pursue the criminal objective, and the offense is complete upon the formation of the agreement. The intent, including knowledge of the intent, must be shared by the individuals. Thus, there must be proof showing that the parties specifically intended to further, promote, advance, or pursue an unlawful objective. [*Id*. (quotation marks and citations omitted).]

James notes that there is no evidence of a direct conversation between him and Bennett where they agreed to kill Dumbuya. Direct evidence, however, is unnecessary. See *id*. ("Direct proof of a conspiracy is not required; rather, proof may be derived from the circumstances, acts, and conduct of the parties."). Here, when viewed in the light most favorable to the jury's verdict, the evidence shows that James wanted to find someone in Detroit to prevent Dumbuya from testifying. He initially asked Eckford to come to *Grand Rapids* to help his deal with his CSC problem. That is significant because Dumbuya lived in Grand Rapids, whereas the "guy" James spoke about with Eckford lived in Saginaw. When Eckford refused to help, he referred James to Bennett as someone who knew the "streets" and would be "cool" with helping James kill someone. After hiring Bennett, James and Bennett worked in concert to effectuate the commission of a murder. They traveled from Detroit to Grand Rapids and scouted Dumbuya's apartment complex the night before her disappearance. Then, after dumping her body in Kalamazoo, they travelled together to a car wash in Grand Rapids. Later, they both returned the loaner vehicle with

Dumbuya's DNA in the back seat. Bennett received the second half of his payment for helping James. Taken together, the actions of James and Bennett allow for a reasonable inference that thy formed an unlawful agreement with the specific intent of killing Dumbuya.

Finally, James argues that there is insufficient proof to establish venue, so his conviction should be overturned. The venue statute, MCL 762.8, provides: "Whenever a felony consists or is the culmination of 2 or more acts done in the perpetration of that felony, the felony may be prosecuted in any county where any of those acts were committed or in any county that the defendant intended the felony or acts done in perpetration of the felony to have an effect." Here, the record reflects that before killing Dumbuya, James and Bennett intercepted her on her way from her home to the bus stop. That act, done to perpetrate the murder, was done in Grand Rapids, i.e., in Kent County. In addition, James made numerous statements indicating that he wanted to silence Dumbuya as a witness against him in the CSC case pending in Kent County, and after her death, he made multiple statements indicating that those charges were or were about to be dropped. Thus, the jury could reasonably infer from the evidence presented that the purpose of the murder was intended to have an effect in Kent County. Accordingly, there is no merit to James's argument that venue was not properly established for the murder conviction. Likewise, regardless of whether the unlawful agreement forming the basis for the conspiracy conviction was completed in Detroit or Grand Rapids, it is clear that the purpose of that felony was intended to have effect in Kent County because, again, James wanted the CSC charges in Kent County to be dropped. Moreover, even if venue was improper reversal is not warranted. MCL 600.1645 expressly provides that "[n]o order, judgment, or decree shall be void or voidable solely on the ground that there was improper venue.

In a related argument in his Standard 4 brief, James argues that the trial court erred by denying the defense motion for a directed verdict. However, in light of the above evidence, it is clear that there was sufficient evidence to send the charges to the jury.

## II. OTHER-ACTS EVIDENCE

### A. STANDARD OF REVIEW

James argues that the trial court abused its discretion by admitting Bibbs's testimony detailing how James had sexually assaulted Dumbuya on a number of occasions between July 2017 and September 2017. We review for an abuse of discretion a trial court's decision to admit evidence under MRE 404(b). *People v Denson*, 500 Mich 385, 396; 902 NW2d 306 (2017). "A trial court abuses its discretion when it chooses an outcome that falls outside the range of principled outcomes." *People v Musser*, 494 Mich 337, 348; 835 NW2d 319 (2013).

### B. ANALYSIS

Under MRE 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive . . . ." In order to be admissible under MRE 404(b), the other-acts evidence must be offered for a proper purpose, must be relevant to an issue or fact of consequence at trial, and the probative value of the evidence must not be substantially

-10-

outweighed by the danger of unfair prejudice. *People v VanderVliet*, 444 Mich 52, 55; 508 NW2d 114 (1993), amended 445 Mich 1205 (1994).

In this case, the prosecution sought to introduce Bibbs's testimony to show that James had a motive to kill Dumbuya. Proof of motive is a proper, non-character purpose. See MRE 404(b). In addition, the evidence was relevant to a fact of consequence at James's trial, i.e., whether James killed or aided and abetted Bennett in killing Dumbuya. Other-acts evidence is logically relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *People v Sabin (After Remand)*, 463 Mich 43, 56-57; 614 NW2d 888 (2000), quoting MRE 401. "If a prior act tends to show why a perpetrator committed a 'seemingly random and inexplicable attack,' then the prior act is relevant for purposes other than the impermissible purpose of showing a defendant has a propensity for violence." *People v Orr*, 275 Mich App 587, 591; 739 NW2d 385 (2007) (citation omitted).

On appeal, James argues that there is no proper purpose because other evidence shows that he admitted to having sex with Dumbuya and she disclosed his actions to a school counselor. In support, James points out that he was initially charged with four counts of CSC-III under MCL 750.520d(1)(a), which criminalizes sexual penetration with a person who "is at least 13 years of age and under 16 years of age." James asserts that, as a result, Bibbs's testimony regarding "the nature of the sexual conduct" does not support any alleged motive that James had to murder Dumbuya. James's theory at trial was that he had "voluntary sex" and that Dumbuya "was of age." Under James's theory, the motive-inference arising from the CSC-III charges could be considered so long as the jury heard evidence that James had sex with Dumbuya when she was 15 years old. However, the fact that other relevant and admissible evidence may establish the same motive, does not negate the fact that the challenged evidence is also proffered for a proper purpose and is also relevant. Instead, the presence of other, less prejudicial evidence supporting a defendant's motive must be evaluated under MRE 403's balancing test.

Under MRE 404(b)(1), relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice and there are other means of proof. *People v McGhee*, 268 Mich App 600, 609; 709 NW2d 595 (2005). "Unfair prejudice exists when there is a tendency that evidence with little probative value will be given too much weight by the jury." *Id*. at 614.

James argues that the probative force of Bibbs's testimony is, essentially, identical to the probative force of other evidence. We disagree. Dumbuya's counselor and the lead detective in the CSC case testified that Dumbuya disclosed the sexual abuse in November 2017, but they offered no details as to what she disclosed. Further, although James admitted to his mother and the police that he had sex with Dumbuya, he told them that it was consensual and suggested that he thought she was old enough to have sex with him. In contrast, Bibbs's testimony shows that the contact was not consensual. Thus, Bibbs's testimony was necessary to show the true nature of the sexual contact between James and Dumbuya. James's statements both before and after Dumbuya's murder make it clear that, despite admitting to the police and his mother that he had consensual sex with Dumbuya, he was still acutely concerned about her testifying against him. He told multiple people that she was "lying." Given that he already admitted to having consensual sex with her while Bibbs was present, it is reasonable to infer that he was accusing her of lying

when she said that the sex was nonconsensual. Dumbuya's sworn testimony detailing exactly what James did to her would have undermined the story he was telling members of the community and his own family. Therefore, the nonconsensual nature of his sexual relationship with Dumbuya was highly probative of his motive to kill her.

Further, the probative value of that evidence was not substantially outweighed by the danger of unfair prejudice. Bibbs's testimony was brief and was not as detailed and salacious as James argues it was. Bibbs testified that the first time James had sex with Dumbuya was in the back seat of James's vehicle. He stated that he held Dumbuya's hand while James penetrated Dumbuya's vagina with his penis and his tongue. Bibbs stated that he and Dumbuya were both scared and did not want it to happen; he added that although Dumbuya did not physically fight James, she told him no. He also testified that James also sex with Dumbuya at his house, at a vacant apartment, and in a second vehicle. Given the brief and general nature of the testimony, the prejudicial effect of the testimony regarding the nature of the sexual contact was not that great. Moreover, the prejudicial effect was lessened by the fact that the prosecution only briefly argued—based on Bibbs's testimony and the other properly admitted testimony regarding the CSC charges—that James acted on his motive to kill Dumbuya. Finally, the jury was provided with a limiting instruction, detailing how it could use the other-acts evidence, including Bibbs's testimony, and that instruction further decreased the prejudicial effect of the testimony.

Regardless, even if the trial court abused its discretion by admitting Bibbs's testimony, we conclude that the error was harmless. "Under MCL 769.26, a preserved, nonconstitutional error is not grounds for reversal unless, after an examination of the entire cause, it affirmatively appears that it is more probable than not that the error was outcome determinative." *People v Williams*, 483 Mich 226, 243; 769 NW2d 605 (2009). "That inquiry focuses on the nature of the error and assesses its effect in light of the weight and strength of the untainted evidence." *People v Mateo*, 453 Mich 203, 215; 551 NW2d 891 (1996). "In other words, the effect of the error is evaluated by assessing it in the context of the untainted evidence to determine whether it is more probable than not that a different outcome would have resulted without the error." *Denson*, 500 Mich at 396-397 (quotation marks and citation omitted).

Here, the untainted evidence of James's guilt was overwhelming. Even without Bibbs's testimony that James had nonconsensual sex with Dumbuya, there was untainted evidence showing that he admitted having consensual sex with her to the police and his mother, she disclosed the sexual relationship to a school counselor, and he was facing criminal charges as a result. While he was in jail, he told an inmate that he was going to contact someone in Detroit to prevent her from testifying. When he got out, he followed her from her apartment to her school. He entertained using a gun to kill her, going so far as to purchase a gun from Eckford before deciding that method was going to be too loud. He asked Eckford to help him resolve his issue with the rape case and when Eckford refused, he asked for a referral to a hit man. When he got the referral, he continued his plan to kill Dumbuya, picking up Bennett in Detroit and bringing him to Grand Rapids. Phone evidence shows that James scouted out the area near Dumbuya's apartments/bus stop the night before and Bennett was in the same general area as her bus stop the morning she disappeared. James was linked to a black 2018 GMC Acadia that appeared on trail cams near where Dumbuya's body was dumped. James's DNA was on her pant leg despite the fact that she had no contact with him between November 2017 and her death. In addition, Dumbuya's DNA was in the backseat of the Acadia despite the fact that James only received the vehicle on a

temporary basis in January 2018. James made false statements to his girlfriend regarding his whereabouts on January 24, 2018. After Dumbuya went missing but before her body was found, James made numerous statements suggesting that the CSC charges against him had been or were about to be dropped and that the CSC situation had been resolved in his favor. Also relevant to James's consciousness of guilt is the fact that, when communicating with Eckford from jail, he used another inmate's name on his outgoing mail. He also used another inmate's jail ID to try to contact a witness in the case, which is reflective of a consciousness of guilt. See *People v Unger*, 278 Mich App 210, 227; 749 NW2d 272 (2008) ("A jury may infer consciousness of guilt from evidence of lying or deception."). In light of our examination of all the evidence, we conclude that any error in admitting Bibbs's testimony was harmless.

## IV. EXCLUSION OF EVIDENCE

### A. STANDARD OF REVIEW

James next argues that the trial court abused its discretion by excluding testimony that James had a sexual relationship with a victim advocate working at the prosecutor's office. The decision whether to admit evidence is within the trial court's discretion and will be reversed on appeal only if there is an abuse of discretion. *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999).

### B. ANALYSIS

The trial court held that evidence that James had a sexual relationship with a victim advocate working at the prosecutor's office was inadmissible because it was irrelevant. Irrelevant evidence is inadmissible. MRE 402. In *People v Rajput*, ___ Mich ___, ___; ___ NW2d ___ (2020) (Docket No. 158866); slip op at 5, our Supreme Court explained:

> Under MRE 401, "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable" is relevant. Accordingly, evidence is relevant if it is material and has probative value. See *People v Crawford*, 458 Mich 376, 388; 582 NW2d 785 (1998). "Materiality is the requirement that the proffered evidence be related to 'any fact that is of consequence' to the action." *Id.*, quoting MRE 401. And evidence has probative value when it "tends 'to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence.' " *Crawford*, 458 Mich at 389-390, quoting MRE 401. This "threshold is minimal: 'any' tendency is sufficient probative force." *Crawford*, 458 Mich at 390, quoting MRE 401.

James argues on appeal that "[a]lthough their romantic relationship had ended on bad terms," he may have believed that his prior relationship with the victim advocate meant that she would successfully exert pressure to have the charges dropped because he might have thought she still had some affection for him. Yet, he made no offer of proof in support of his contention that he did, in fact, believe such a thing. In addition, his relationship with the advocate concluded before he met Dumbuya, and although she saw him on the day of the preliminary examination, she had no contact with after the examination. If, after the preliminary examination, James started

telling people that the charges were going to be dropped, it could be reasonable to infer that he thought the reason was because of his relationship with the victim advocate. That did not happen, however. Instead, James began making statements that the case had been or was about to be dropped after January 24, 2018. Nothing in the record suggests that anything had changed between him and the victim advocate at that point. Rather, the main change after January 24, 2018 was that Dumbuya had been murdered and her body discarded in Kalamazoo. In light of the timing of James's statements when compared to when the victim advocate became involved, and in light of the absence of any evidence actually showing that James believed she would or could influence the prosecutor on his behalf, we agree with the trial court that the victim advocate's testimony was speculative and irrelevant.

James also suggests that the testimony about his prior relationship with the victim advocate would have bolstered his defense theory that the Kent County prosecutors and police "prejudged" James as guilty and then tailored the evidence to fit that theory. At trial he elicited evidence suggesting a rush to judgment by the police and prosecution, but he did not argue that the victim advocate's testimony would have also advanced that theory. Further, there is nothing on the record suggesting that the victim advocate had any effect whatsoever on the murder investigation conducted by the Kalamazoo police and the Grand Rapids police, nor that she had any impact on the prosecutorial decisions associated with the murder case. James's argument on appeal that the way he treated the victim advocate may have "poisoned the well" is a bare supposition devoid of any factual support.

## V. PROSECUTORIAL MISCONDUCT

### A. STANDARD OF REVIEW

Finally, in his Standard 4 brief, James argues that the prosecutor committed misconduct during closing arguments by arguing facts not in evidence. This issue is unpreserved because James did not contemporaneously object and request a curative instruction for the alleged prosecutorial misconduct. See *Bennett*, 290 Mich App at 475. Unpreserved prosecutorial misconduct claims are reviewed for plain error affecting the defendant's substantial rights. *People v Thomas*, 260 Mich App 450, 454; 678 NW2d 631 (2004).

### B. ANALYSIS

James contends that the prosecutor injected facts not in evidence when she made the following arguments. The prosecutor stated that Dumbuya was supposed to head to the bus stop at around 6:00 a.m., but that Bennett's phone was still in the area around 7:00 a.m., that it was "dark and he's trying to kill her, or it takes longer than he wants," and that "I don't know what happened at that bus stop when they grabbed her, or Bennett grabbed her and killed her, but something went a little haywire." We do not agree that the prosecutor misstated the facts in the above argument. Rather, she acknowledged that there was not any evidence of what exactly happened between 6:00 a.m. when Dumbuya left home for the bus stop and around 7:00 a.m. when Bennett's phone pinged off a tower in the vicinity of the bus stop. Because the statements accurately reflected the evidence and were based off of a reasonable interpretation of that evidence, they were not improper.

Similarly, James suggests that the prosecutor's statements that she did not have direct evidence putting James right at the bus stop at 6:00 a.m. is proof that she lacked evidence to convict him. However, again, that is merely a reflection of the evidence that was admitted at trial, and there is nothing improper about that comment.

Next, James argues that the prosecutor committed misconduct by making the following statement:

> They're down in the area of the pumphouse for another nine minutes. More than enough time, according to the detective's investigation, to get out the vehicle, park at the pumphouse and put the body in the woods.

James points out that the detective testified that the trail was not visible from the cameras near the pumphouse and only the driveway of the pumphouse was visible. However, the evidence supported that the vehicle passed the surveillance video near the pumphouse and that after approximately nine minutes, it passed the surveillance spot heading in the other direction. The officer testified that there was enough room to turn around at the pumphouse, and he noted that it was out of view while it was down by the pumphouse. In sum, as the prosecutor's argument was again supported by the evidence, it was not improper.

Next, James appears to argue that the prosecutor's statements that Eckford committed perjury were improper. Eckford, however, was charged with perjury, which he admitted when he testified. The prosecutor's recitation of that fact was not improper.

Finally, James also argues that his defense lawyer was ineffective for failing to object to the above prosecutorial misconduct. However, as none of the prosecutor's remarks were improper, any objection by James's defense lawyer would have been futile. "It is well established that defense counsel is not ineffective for failing to pursue a futile motion." *People v Brown*, 279 Mich App 116, 142; 755 NW2d 664 (2008).

Affirmed.

/s/ James Robert Redford
/s/ Jane M. Beckering
/s/ Michael J. Kelly